G. Jaap LOVINK, Plaintiff–Appellee,

v.

GUILFORD MILLS, INC.,
Defendant–Appellant.

No. 607, Docket 88–7838.

United States Court of Appeals,
Second Circuit.

Argued Jan. 13, 1989.

Decided June 21, 1989.

John C. Grosz, New York City (Solinger Grosz & Goldwasser, P.C., Alan A. Harley and Stacy M. Leopold, New York City and Lester A. Lazarus, P.C., Lester A. Lazarus and Harlan M. Lazarus, New York City, of counsel), for defendant-appellant.

Steven G. Eckhaus, New York City (Kelly, Eckhaus & Mohen, and Roger D. Olson, New York City, of counsel), for plaintiff-appellee.

Before VAN GRAAFEILAND, MESKILL and MINER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Guilford Mills, Inc. ("Guilford"), a North Carolina textile knitting company, appeals from a $5.2 million judgment of the United States District Court for the Southern District of New York which followed a jury trial before the late District Judge Richard Daronco and a jury. We reverse and remand for retrial.

For several years prior to 1983, appellee, G. Jaap Lovink, was president of Verosol B.V., a wholly-owned American subsidiary of a Dutch company named Blydenstein Willinck and a major producer of pleated window shades. In 1983, because of "[d]ifferences of opinion, how to manage the business of the company in this country," Lovink resigned. Following his resignation, he hoped to form a business of his own, a corporation with only a select few outside shareholders. Instead, on February 1, 1984, he entered into an employment contract with Guilford. The $5.2 million judgment in favor of Lovink is based upon alleged breach of this contract.

The contract provided that Guilford would create a new window treatment division and that Lovink would be president and managing director of the division. The contract was for a base term of five fiscal years ending June 30, 1989, but this term was contingent upon the division meeting certain annual goals. The contract contained a five-year projection of anticipated sales and income and provided that, if in any year the sales or operating income was less than 85 percent of the projected figure, Guilford might terminate Lovink's employment. The contract also provided for a five-year renewal term that would go into effect automatically if division sales during the initial five-year term exceeded $70 million and operating income, averaged over the five-year period, exceeded 18 percent of sales. Lovink was to receive a base salary of $100,000 plus incentive compensation equal to 1 percent of net sales and 7 percent of pretax operating income, with an annual overall ceiling of $750,000.

As Lovink reasonably might have anticipated, running a division of a large company such as Guilford presented numerous problems that would not vex a small independent corporation. Plant facilities and equipment had to be allocated, bookkeeping and billing practices coordinated, major expenditures approved, quality maintained, and goodwill protected. Difficulties and disagreements inherent in the solution of

these problems almost inevitably resulted in claims by Lovink that Guilford was in breach of his employment contract. A few examples will suffice. Guilford refused to market flame-retardant material called "Decopleat" because its colors faded in strong sunlight. Lovink claimed that several colors of Decopleat had better light fastness than the product he had sold for Verosol. He asserts, therefore, that Guilford's refusal to market Decopleat constituted a breach of contract. Guilford decided to use a yarn manufactured by one company rather than a yarn manufactured by another. Guilford's expressed reason for doing this was that the second company's yarn varied in width and often snagged during the knitting process, creating "an abnormal high amount of seconds." Lovink claimed that this was a breach of his contract. Guilford refused to authorize the purchase of a second ninety-inch pleating machine because the first ninety-inch machine, whose purchase Guilford had authorized, was not being fully utilized. Again, breach of contract is alleged. The foregoing examples are not all-inclusive; however, they are typical. It is upon acts such as these that Lovink's breach of contract claim largely is based.

On January 23, 1985, Lovink sent a memo to the Chairman of Guilford's Board presenting him with the following four options for future conduct:

1. The window shade division is closed down, and the inventory and equipment are sold.
2. Lovink resigns.
3. The window shade division is continued with Lovink in "full control" and with production and marketing operations independently and physically separated from Guilford.
4. Feasibility of making the window shade division a joint venture with investors, competitors or customers is explored.

We do not know whether Lovink anticipated that Guilford would accept his offer to resign. His diary for January 31, 1985 contains the notation "Battle eager, can they do without Lovink empire?" Regard-

less of what Lovink anticipated, his offer to resign was accepted, and he resigned. His contract provided that, in the event of voluntary termination, he would receive his salary to the date of termination and prorated incentive compensation. He was offered $75,000 to reflect these amounts at the time he resigned, but he refused it. He sued instead for breach of contract.

The district court agreed, and correctly so, with Guilford's contention that Lovink's resignation was not the product of unlawful duress and refused to submit this issue to the jury. However, the district court then proceeded to treat the resignation almost as if it hadn't occurred, stating "if the jury believes the plaintiff's claim for breach of contract, he had no alternative but to leave." This broadbrush treatment of the nature and effect of Guilford's alleged breach of contract carried over into the district court's charge on the subject, which is contained in one, clearly inadequate sentence:

Now, if plaintiff establishes by a preponderance of the evidence that defendant failed to perform under the contract and, further, that defendant's failure of performance substantially contributed to the failure of Windecor Division to meet the sales and profitability projections contained in the agreement, your verdict on plaintiff's breach of contract claim will be for the plaintiff, and you will then consider the issue of damages.

A breach of contract may be either partial or total. A total breach justifies termination of the contract and damages for complete failure of performance; a partial breach does not. 11 Williston on Contracts § 1292 at 8–11 (3d ed. 1968); 4 Corbin on Contracts § 946 at 809–13 (1951); 17A C.J.S. Contracts § 474 at 670 (1963); Coleman v. Shirlen, 53 N.C.App. 573, 281 S.E.2d 431, 434 (1981); Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co., 470 F.Supp. 1308, 1322 (N.D.N.Y.1979). The distinction between partial and total breach is particularly important in executory contracts such as the one in the instant case, where the parties are merely in the initial phase of a five-year program.

"The contract sued upon is executory in part and before plaintiff may sue for its breach he must show an absolute repudiation by language or act making it futile for him to proceed." *Didier v. Macfadden Publications, Inc.,* 299 N.Y. 49, 53, 85 N.E. 2d 612 (1949); *see Garcia v. Chase Manhattan Bank, N.A.,* 735 F.2d 645, 648–49 (2d Cir.1984); *Gittlitz v. Lewis,* 28 Misc.2d 712, 713–14, 212 N.Y.S.2d 219, *appeal dismissed,* 14 A.D.2d 783 (1961); 22 N.Y.Jur. 2d *Contracts* § 389 at 298–300 (1982); *Restatement (Second) of Contracts* § 237 at 215–23 (1981).

■ As pointed out above, the basic contract in the instant case was for a five-year term, conditioned upon Lovink meeting certain annual projected quotas. The projected quota for the first year of the contract was 85 percent of $4 million in sales. At the time Lovink resigned, five months still remained during which this goal could have been achieved. Moreover, Lovink testified on numerous occasions that he believed that this could be done:

Q. As of the date of this memorandum [January 23, 1985], did you believe it was still possible to meet your projections of $4 million in sales in the first full fiscal year ending June 30, 1985?

A. Yes, that would have been still possible.

■ Since there was no proof whatever concerning inability to meet the "sales and profitability projections" for the ensuing four years of the contract, the district court clearly erred in instructing the jury that it should find for Lovink if Guilford's "failure of performance substantially contributed to the failure ... to meet the sales and profitability projections contained in the agreement." In short, Lovink's proof was insufficient to justify an award of damages based upon total breach of contract. The district court should have instructed the jury to differentiate between a total or material breach on the one hand and a partial breach on the other, and to measure damages, if any, according to the nature of the breach. The charge as given was erroneous and requires the granting of a new trial.

■ Assuming, for the argument only, that Lovink was entitled to a full award based on a total breach, the $5.2 million verdict was excessive and improper. It is undisputed that the verdict was based on an assumed automatic renewal of the five-year contract and maximum compensation during the renewal period. However, such renewal would not have occurred unless actual sales for the five basic years exceeded $70 million and "the Net Operating Income of the Division ... for the five full fiscal years of the Company during the initial term hereof exceed[ed], on the average, eighteen percent (18%) of the net sales of the Division for such period, such average to be determined by dividing the net sales of the Division for each full fiscal year of the Company during the term hereof by the Net Operating Income of the Division for each such year and by then averaging the five annual figures as so determined."

All discussions of sales during the five basic years of the contract were based on the projections contained in the contract. These projections represented a goal that the parties hoped to attain, not one that was certain of attainment. Indeed, the parties recognized that, even as of June 30, 1989, the original termination date, it might take time to determine whether the contract was to be renewed automatically. The contract provided that "[i]n the event that it cannot be determined prior to expiration of the initial term hereof whether the term of this Agreement will be automatically renewed pursuant to this paragraph 10.3, it is understood that the term hereof shall continue on a month-to-month basis until such determination can be made...."

The contract provides that it shall be construed in accordance with the laws and judicial decisions of the State of North Carolina. The North Carolina courts, whose decisions are thus accorded deference, take a conservative approach to the award of damages based on lost profits. As they reason:

There are many contingencies attendant upon all business—the possible loss by fire, the breaking of machinery, death, sickness, and other causes, may interrupt or suspend its prosecution. These cannot be estimated in advance, and profits must be largely dependent upon them. It is for this reason that the actual, not conjectural, loss constitutes the plaintiff's claim to compensation.

*Sprout, Waldron & Co. v. Ward,* 181 N.C. 372, 374, 107 S.E. 214, 215 (1921) (quoting *Jones v. Call,* 96 N.C. 337, 344–45, 2 S.E. 647, 650 (1887)). Based upon reasoning such as this, the North Carolina courts "will not permit mere profits, depending upon the chances of business and other contingent circumstances, and which are perhaps merely fanciful, to be considered by the jury as part of the compensation." *Sprout, Waldron, supra,* 181 N.C. at 374, 107 S.E. 214 (quoting *Winston Cigarette Machine Co. v. Wells–Whitehead Tobacco Co.,* 141 N.C. 284, 297, 53 S.E. 885, 889 (1906)); *see also Lawrence v. Stroupe,* 263 N.C. 618, 622, 139 S.E.2d 885, 887–88 (1965); *Weyerhaeuser Co. v. Godwin Building Supply Co.,* 292 N.C. 557, 561, 234 S.E.2d 605, 607 (1977). These holdings are particularly relevant in the instant case since there was not even a projection as to the net sales or operating income for the five-year renewal term, the period for which the jury made a maximum award of damages.

Finally, in the interest of justice, we cannot overlook the district court's failure to instruct the jury that any award for future damages had to be discounted to present value. Because Guilford's counsel failed to bring this matter to the attention of the district court, the district court's failure to charge, standing alone, might not be sufficiently "plain error" to require reversal. *See McNamara v. Dionne,* 298 F.2d 352, 355–56 (2d Cir.1962). *But see Daughtry v. Cline,* 224 N.C. 381, 386–87, 30 S.E.2d 322, 325 (1944) (concurring opinion). However, since " '[p]lain error' review under Rule 51 is suited to correcting obvious instances of injustice", *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 256, 101 S.Ct. 2748, 2754, 69 L.Ed.2d 616 (1981), we con-

sider the district court's failure to charge discounted value as one more reason why there should be a new trial.

Reversed and remanded for retrial.