Process America v. Cynergy Holdings

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

August Term, 2015

(Argued: June 6, 2016    Decided: October 5, 2016)

Docket No. 15-2081-cv

———————————

PROCESS AMERICA, INC.,[*]

*Plaintiff-Counter-Defendant-Appellant*,

— v. —

CYNERGY HOLDINGS, LLC,

*Defendant-Counter-Claimant-Appellee*.

———————————

B e f o r e:

SACK and LYNCH, *Circuit Judges*, and MURTHA, *District Judge*.[**]

———————————

———————————

[*] The Clerk of Court is directed to amend the caption of the case.

[**] Judge J. Garvan Murtha, of the United States District Court for the District of Vermont, sitting by designation.

Plaintiff-Counter-Defendant-Appellant Process America, Inc. ("Process America") appeals from the judgment of the United States District Court for the Eastern District of New York (Brian Cogan, *Judge*) awarding damages following a bench trial limited to the issue of Defendant-Counter-Claimant-Appellee Cynergy Holdings, LLC's ("Cynergy") damages on its counterclaims, and from a series of interim rulings prior to the trial. Process America sued Cynergy for breach of contract. Cynergy counterclaimed, alleging, *inter alia*, that Process America improperly solicited its customers.

Following cross-motions for summary judgment, the district court held that Process America breached the parties' contract by soliciting Cynergy's customers following termination of the contract and that Cynergy's own breaches of contract did not vitiate Process America's obligation not to solicit customers. *In limine*, the district court additionally concluded that a contractual damages cap limited Cynergy's liability to approximately $300,000. After conducting a bench trial, the court found that Process America was responsible for the increased rate at which customers canceled their contracts with Cynergy and awarded Cynergy over $8.8 million in damages, offset only by the approximately $300,000 awarded to Process America.

We AFFIRM the district court's holdings with respect to liability. We conclude, however, that the method of calculating damages gave Cynergy more than the expected value of the contract because it did not account for saved costs, and accordingly VACATE and REMAND for calculation of damages in conformity with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

---

MITCHELL C. SHAPIRO, Carter Ledyard & Milburn LLP, New York, New York, *for Plaintiff-Counter-Defendant-Appellant* Process America, Inc.

MICHAEL C. MARSH (Jennifer C. Glasser, Katherine E. Giddings, and Diane G. DeWolf, *on the brief*), Akerman LLP, Miami, Florida and Tallahassee, Florida, *for Defendant-Counter-Claimant-Appellee* Cynergy Holdings, LLC.

---

2

GERARD E. LYNCH, *Circuit Judge*:

This case arises from the termination of a commercial relationship between Plaintiff-Counter-Defendant-Appellant Process America, Inc. ("Process America") and Defendant-Counter-Claimant-Appellee Cynergy Holdings, LLC ("Cynergy"). Process America is an Independent Sales Organization ("ISO") that, prior to the termination of their relationship, solicited and referred merchants to Cynergy, a bankcard processor. Following the termination of the relationship between Process America and Cynergy, Process America sued Cynergy for breach of contract. Cynergy counterclaimed, contending, among other things, that Process America improperly solicited Cynergy's clients. Following a series of interim decisions and a bench trial limited to the issue of damages on Cynergy's counterclaims, the district court held that although both parties had breached the contract, Cynergy's liability was capped by the contract. The district court awarded Cynergy a net total of $8,521,182 in damages. Process America appeals.

## BACKGROUND

### I. Merchant Services Generally

The parties are involved in the "merchant services" industry, which provides credit and debit card transaction processing services to merchants. The

3

basic mechanics of the process by which bankcard transactions are conducted

may be summarized as follows:

> [T]he customer presents a credit card to pay for goods
> or services to the merchant; the merchant relays the
> transaction information to the acquiring bank; the
> acquiring bank processes the information and relays it
> to the network [*e.g.,* Visa or MasterCard]; the network
> relays the information to the issuing bank; if the issuing
> bank approves the transaction, that approval is relayed
> to the acquiring bank, which then relays it to the
> merchant. If the transaction is approved, the merchant
> receives the purchase price minus two fees: the
> "interchange fee" that the issuing bank charged the
> acquiring bank and the "merchant discount fee" that the
> acquiring bank charged the merchant.

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 228

(2d Cir. 2016).

Acquiring banks – which are also known as "sponsor banks" – are

financial institutions that are members of the Visa or MasterCard network.

Generally, the acquiring banks delegate merchant solicitation, processing,

underwriting, and customer service obligations to "Processors," who manage

card transaction processing, ISO recruitment, merchant customer services,

liability for merchant losses, and fraud monitoring, and to ISOs, who solicit

merchants to offer them the services of an acquiring bank and access to a

4

Processor. An ISO's primary role is to solicit new merchants and then provide first-line customer support. ISOs are paid a portion of the discount fee paid by merchants to the acquiring bank.

## II.     The Relationship between Cynergy and Process America

Cynergy provides back-end processing services for credit and debit card transactions through its relationship with its acquiring bank, Harris Bank N.A./Moneris ("Moneris"). After receiving funds from the issuing bank, Moneris receives, and holds, merchant funds for one to three days before remitting any portion to the merchant. Cynergy calculates the money due to merchants through its proprietary platform called VIMAS.

In 2004, Process America signed a standard ISO agreement (the "ISO Agreement") with Cynergy's predecessor, Cynergy Data (hereinafter "Old Cynergy").[1] Pursuant to the ISO Agrement, Process America sold Cynergy's bankcard processing services to merchants and received as compensation a portion of the discount fee charged to merchants, known as "residuals."

---

[1] Old Cynergy filed for bankruptcy in 2009. Cynergy Holdings, LLC – referred to in this opinion merely as "Cynergy" – acquired the rights and obligations arising under the ISO Agreement from Old Cynergy.

5

As relevant to this appeal, the ISO Agreement states that Cynergy "owns" the merchant agreements solicited by Process America, but that, upon satisfaction of certain benchmarks, ownership of those agreements will "vest" in Process America. J.A. 202. That contract provision also describes the mechanism by which Process America may transfer the merchant accounts to a third-party processor. Additionally, the contract contains a non-solicitation clause that bars Process America from soliciting any merchant with whom Cynergy has a contract for a period of five years following the termination of the ISO Agreement and also contains a damages cap limiting Cynergy's liability. The contract further provides that Cynergy must continue to make residual payments to Process America unless Cynergy terminated the contract "due to a material breach" by Process America. J.A. 210.

The ISO Agreement also incorporates by reference the rules created and enforced by the credit card networks, Visa and MasterCard (the "Rules"). The Rules prohibit ISOs like Process America from directly accessing or holding merchant funds, which must instead be held by acquiring banks.

Under the terms of the ISO Agreement, Process America is fully liable for merchant chargebacks, which are consumer reversals of transactions, typically

6

due to fraud. In order to reduce chargeback losses, Process America developed the "Chargeback Reduction Incentive Program," known as "CRIP." Process America characterizes CRIP as a rewards program funded by Process America's own residuals wherein merchants who followed a list of "best practices" were rebated a portion of their fees. Cynergy, by contrast, characterizes CRIP as a merchant reserve in which, in clear contravention of the Rules, Process America retained funds owned by merchants to offset the cost of chargebacks.

## III. Termination of the Relationship

In January 2011, Moneris sent Cynergy a letter stating, in relevant part, that:

> [O]ne of Cynergy's ISOs, Process America, appears to be retaining funds from Merchants as security against merchant liabilities. Because this would clearly fall within the definition of Merchant Reserves in Cynergy's attestations and make those attestations inaccurate, we wanted to formally register our concerns regarding Process America's practices and demand that the following actions be taken immediately . . .
>
> 1. Terminate Process America as an ISO. . . .
>
> Until these steps have been taken, Moneris considers Cynergy to be in breach of its obligations . . . .

J.A. 1350. In response, Cynergy informed Moneris that it was taking steps to identify merchant funds held by Process America, but would "not immediately terminate Process America's processing agreement," and would instead not renew the agreement upon its expiration in May 2011. J.A. 1355. Moneris responded that, "[i]f the funds in this reserve have been returned in full as you indicate below, then it would appear that that particular breach has now been cured," J.A. 1352, but also requested a full audit of Process America's accounts.

Shortly after receiving the letter from Moneris, Cynergy ceased making residual payments to Process America. Approximately one month later, Cynergy sent Process America a letter stating in part:

> We hereby notify you that we find you in material breach of the [ISO] Agreement. Among other provisions, we find that you have breached your representations and warranties under Sections 4.1 F (No Violation) and 4.1 G (Compliance). These breaches stem from your withholding and maintaining merchant funds in reserve in violation of the Rules. Naming a reserve an insurance program merely obfuscates the facts but does not lessen the violation or the breach. Further, we find that you are in material default pursuant to Sections 6.3 C (False Representation), 6.3 D (Breach) and 6.3 E (Goodwill) also in relation to your withholding and maintaining merchant funds as a reserve. As a result of the Section 6.3 C and 6.3 E events, we hereby terminate the Agreement immediately and intend to fully enforce ramifications upon termination.

8

> Despite the Events of Default that we believe to be irrefutable, pursuant to Section 6.2 B of the Agreement by providing notice ninety days prior to the renewal date, either party may choose not to renew the Agreement and as such we hereby provide notice of non-renewal. To be clear, this notice is not relief from your Events of Default but clear notice that we shall ensure your contract will not continue.
>
> This letter is provided in accordance with the notice provisions of Section 7.2 of the Agreement.

J.A. 2619-20. Process America then contracted with approximately 25% of the merchants in its portfolio of merchant agreements (the "Portfolio") on behalf of another processor and subsequently sold that portion of the Portfolio for approximately $2 million. In attempting to get merchants to change processors, Process America referenced Old Cynergy's earlier bankruptcy and, in some instances, suggested that funds held in the merchant's account could be at risk. Following the period in which Process America sought to induce merchants to switch processors, a number of merchants canceled their contracts with Cynergy. In total, the rate of post-termination attrition was 79%. The attrition rate for the six-month period preceding termination was 16%.

## IV. Procedural History

Process America sued Cynergy, alleging breach of contract and other causes of action. Cynergy counterclaimed, alleging, *inter alia*, that Process America had breached the contract by soliciting merchants and selling the Portfolio and, in the process of soliciting merchants, had also defamed Cynergy. Following cross-motions for summary judgment, the district court held that under the terms of the ISO Agreement, which the parties stipulated were unambiguous, Cynergy, not Process America, owned the Portfolio at the time of Process America's solicitation, and entered summary judgment in Cynergy's favor. The court also determined that there was a material issue of fact as to whether CRIP was a merchant reserve in violation of the Rules, but that if it was, it would be a material breach of the ISO Agreement.

Both parties moved for reconsideration. The district court declined to disturb its holding with respect to the issue of who owned the Portfolio. With respect to CRIP, however, the district court concluded that the prior denial of summary judgment had been premature; held that, in light of the contracts used by Process America to enroll merchants in CRIP, CRIP was a merchant reserve in violation of the Rules; and entered judgment in favor of Cynergy. The district

court nevertheless concluded that, despite the material breach, Cynergy was not entitled to withhold residuals under the terms of the contract without giving Process America notice and an opportunity to cure. The district court therefore entered summary judgment in favor of Process America with respect to its breach of contract claim based on the improper withholding of residuals, but dismissed all of its remaining claims. In the same opinion, the district court further held that Cynergy was entitled to summary judgment on its counterclaim based on breach of the non-solicitation clause in the agreement and its defamation counterclaim.

In a separate opinion, following a motion *in limine*, the district court held that the damages cap in the contract limited Process America's recovery to fees derived as a result of the ISO Agreement during the last four months of the Agreement, which the parties stipulated was approximately $300,000. Having dismissed or granted summary judgment on the issue of liability with respect to all of the parties' claims and counterclaims, the district court held a bench trial limited solely to the issue of Cynergy's damages. Measuring damages based on the rate of attrition of merchant accounts in the Portfolio after Process America's solicitation, and rejecting Process America's arguments that the increased attrition rate could be attributable to something other than solicitation, the

11

district court awarded Cynergy $8.82 million in damages, offset only by the $300,000 awarded to Process America for Cynergy's breach of contract.

Process America challenges only some of the district court's rulings. Process America argues that the district court erred in holding that Cynergy owned the Portfolio, that CRIP violated the Rules, that Process America's statements to merchants constituted per se defamation, that Process America's damages were limited to $300,000, and that Cynergy's damages should not be offset by the full value of the withheld residuals. Process America also argues that Cynergy's withholding of residuals allowed it to treat the contract as void. Process America further challenges the district court's finding at trial that Cynergy met its burden in proving damages. Process America does not appeal the district court's dismissal of its other claims. Cynergy did not file a cross-appeal, and does not challenge the district court's conclusion that the withholding of residuals constituted a breach of the ISO Agreement.

## DISCUSSION

On appeal, Process America challenges the district court's interim decisions concluding that it breached the ISO Agreement and that Cynergy's liability for its own breach of contract was limited by the damages cap. Process

12

America also challenges the district court's post-trial findings regarding

Cynergy's damages. We address these issues in turn.[2]

---

[2] We do not, however, address the question of whether CRIP constituted a material breach of the contact. For the purposes of this appeal, whether CRIP constituted a material breach of the contract is relevant only to the extent that it would allow Cynergy to withhold residuals; the district court found that it did not, as Cynergy failed to provide notice and an opportunity to cure. Cynergy does not challenge that decision on appeal, although it argues that Process America's solicitation of customers provides a separate basis for withholding residuals.

With respect to Cynergy's defamation claim, although we agree with the district court that Process America failed to demonstrate that its defamatory statements were substantially true, we note that a determination of the merits of this claim will not have an impact on Cynergy's damages on this record. The district court's damages award, which accepted Cynergy's expert's methodology and the data underlying his conclusions, was based on the overall rate of merchant attrition due to Process America's solicitation. No differentiation was made between the damages Process America owed following its solicitation (which, as discussed *infra*, breached the ISO Agreement) and the damages resulting from Process America's defamation. The district court's operative assumption appears to have been that any defamatory statements for which Process America could be held liable were made solely in connection with Process America's solicitation. There is, however, some record evidence which suggests that Process America's defamation might have caused abnormal attrition of merchants from Cynergy's Portfolio which we understand to be distinct from the abnormal attrition caused by Process America's direct solicitation (via defamatory means or otherwise) of Cynergy's merchants. *See* J.A. 844, 848 (August 2011 e-mails from third-party companies to Cynergy's merchants referencing Cynergy's allegedly recent bankruptcy and unstable financial posture). Because neither party has argued on appeal that Cynergy's expert's calculations were incorrect because they failed to make this distinction, we need not address this issue or Cynergy's defamation claim further.

13

## I. Contract Interpretation Issues

The district court entered judgment on all matters relating to liability on summary judgment or *in limine*.[3] We review a district court's grant of summary judgment de novo. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513, 519 (2d Cir. 2016), quoting Fed. R. Civ. P. 56(a).

New York law governs the ISO Agreement, pursuant to its choice-of-law provision. In interpreting a contract under New York law, "words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks omitted). "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (alterations and internal quotation marks omitted).

---

[3] The motion *in limine* was framed as a motion for summary judgment, and we apply the same standards as we would to a motion for summary judgment. *See Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001).

## A.     The Portfolio

The parties both contend that under the unambiguous terms of the ISO Agreement, they owned the Portfolio at the time that Process America solicited merchants to switch to another processor, to whom Process America ultimately sold approximately 25% of the Portfolio. Section 2.6 of the ISO Agreement, entitled "Ownership of Merchant Agreements," governs the process of transferring and selling the merchant accounts. Section 2.6 provides:

> **A. Ownership.** The parties agree that upon execution of this Agreement, throughout the Initial Term, and until the Ownership Trigger Date, Cynergy Data shall own and have all rights to the Merchant Agreements. *On the Ownership Trigger Date, ownership of the Merchant Agreements will vest in [Process America].* The "Ownership Trigger Date" means anytime after the Initial Term, and the first day of the month following the month in which all of the Ownership Trigger Events are satisfied. An Ownership Trigger Event will be deemed satisfied immediately upon its occurrence. "Ownership Trigger Events" will occur [when Process America meets certain benchmarks] . . . . *Upon satisfaction of the conditions set forth in Section 2.6.B, both parties shall execute an asset transfer agreement reasonably satisfactory to both parties pursuant to which ownership rights in Merchants will be transferred from Cynergy Data to [Process America] for nominal consideration.*
>
> **B. Transfer of Merchants.** *At any time while this Agreement is in effect* and after the Ownership Trigger

15

Date, [Process America] may move all or any portion of the Merchants to a third party credit card processor, subject to all of the following: i) [Process America] grants to Cynergy Data a right of first refusal on the Merchant portfolio. . . . ii) [Process America] shall pay to Cynergy Data an exit fee equal to the average monthly revenue derived by Cynergy Data over the most recent 3 month period, excluding the month of December, attributable to the Merchant Agreements to be transferred multiplied by the greater of either a) the multiple figure offered by the third party, or b) 30. iii) The execution of an assignment agreement between Cynergy Data, [Moneris], and the new credit card processor containing terms typical of such a transaction and satisfactory to [Moneris] and Cynergy Data. Upon satisfaction of i) and ii) and iii), Cynergy Data will cooperate in transferring the Merchant Agreements to the third party designated by [Process America]. . . .

J.A. 202-03 (emphasis added). The non-solicitation clause in Section 3.8 of the ISO

Agreement additionally provides that:

*Except as otherwise provided in Section 2.6.B*, during the term of this Agreement and for 5 years after termination of this Agreement . . . , [Process America] . . . will not directly or indirectly solicit or endeavor to obtain as a customer for credit or debit card processing services, or contract with, any Merchant [who has entered into a merchant agreement with Cynergy] for credit or debit card processing services.

J.A. 204 (emphasis added). Section 7.11 of the ISO Agreement further provides

that both Section 2.6 and Section 3.8 survive termination of the Agreement.

16

It is undisputed that Process America met the benchmarks required for an Ownership Trigger Event, but did not comply with Section 2.6.B's requirements for transfer of the merchant accounts. Pointing to the language in Section 2.6.A stating that "ownership of the [Portfolio] will vest in" Process America "[o]n the Ownership Trigger Date," which occurs after an Ownership Trigger Event is satisfied, J.A. 202, Process America argues that ownership of the Portfolio transferred as soon as it met as the benchmarks required for an Ownership Trigger Event. Cynergy, in turn, references the last sentence of Section 2.6.A which states that, upon satisfaction of the conditions set forth in Section 2.6.B, "ownership rights" will be transferred "from Cynergy . . . to [Process America]." *Id.*

The parties frame the dispute over those provisions as a question of "ownership," with the implication being that if Process America owned the merchant agreements, the sale of the Portfolio would not constitute a breach of contract and Cynergy's "seizure" of the Portfolio would be a breach. The district court resolved the apparently contradictory language by interpreting the term "ownership" to mean the "right to exercise ownership and transfer 'ownership rights' from Cynergy," S.A. 62, rather than "full ownership," S.A. 61.

17

We may resolve the instant appeal, however, by addressing a narrower question than the generalized claim of ownership: whether the solicitation of merchants, and transfer of a portion of the Portfolio to a third party, violate the ISO Agreement which permits transfer only pursuant to Section 2.6.B, such that Cynergy is entitled to damages based on the increased rate of attrition of merchant accounts in the Portfolio. We conclude that it does.

Notwithstanding the ISO Agreement's opaque treatment of the word "ownership," the Agreement contemplates only one method for transferring the merchant agreements contained in the Portfolio to Process America and then to a third party: compliance with Section 2.6.B. Process America has not identified, nor have we found, any other contract provision that would allow for the transfer of merchant agreements.

Section 2.6.B enumerates three conditions that must be satisfied before any transfer may take place, including providing notice and the right of first refusal to Cynergy, paying a substantial fee to Cynergy, and executing a new processing agreement that satisfies both Cynergy and Moneris. Those requirements serve both to provide Cynergy with substantial rights in the Portfolio, even after the Ownership Trigger Date has passed, and to ensure continuity of service in

18

processing bankcard transactions. Given Process America's role in the processing transaction generally – as a salesman and customer service provider, but not as a processor of bankcard transactions – it is unsurprising that the contract includes requirements intended to ensure continuity of service. The only real benefit that Process America can derive from its claimed "ownership" of the Portfolio is the right to sell it to a third-party. Section 2.6.B describes that sale procedure, and further provides Cynergy with substantial rights, including the right of first refusal and the right to an exit fee, until the accounts are actually transferred.

Process America does not dispute that it did not comply, or attempt to comply, with Section 2.6.B prior to soliciting merchants with the intention of selling those accounts to a third party. Rather, it contends that, because Section 2.6.A survives termination of the agreement, it possessed an ownership interest that also survived and therefore Cynergy's purported "seizure" of the Portfolio was wrongful. That argument suffers from two flaws. First, it ignores the fact that, even assuming that Process America "owned" the Portfolio, it was nevertheless a breach of contract to transfer the Portfolio to a different processor without complying with Section 2.6.B. Second, it fails to acknowledge that Section 3.8 flatly prohibits any solicitation of merchants who have contracts with

19

Cynergy. As it is undisputed that the merchant accounts had not been transferred to a third-party prior to Process America's solicitation, Cynergy still had contracts with all of the solicited merchants and any contact with those merchants was in breach of the ISO Agreement.

Our interpretation of Section 2.6 comports with the other provisions of the ISO Agreement. Section 3.8 prohibits solicitation of merchants *"[e]xcept* as otherwise provided in Section 2.6.B." J.A. 204 (emphasis added). And, as Process America itself argues, Section 7.11's survival clause would allow it to transfer the accounts post-termination. *See* Appellant's Br. 27.[4] We thus conclude that Process America's solicitation of merchants, and sale of a portion of the Portfolio without compliance with Section 2.6.B, constitutes a breach of contract, and that Process America may be liable for the resulting increased attrition of merchants in the Portfolio.

---

[4] We note that Section 2.6.B begins by stating that Process America may transfer accounts to a third-party processor "[a]t any time while th[e ISO Agreement] is in effect." Process America does not argue that this language would preclude it from transferring the Portfolio to a third party after the contract was terminated; indeed, Process America points to an admission by Cynergy's counsel that, "'[i]f, after termination, Process America had come to us and said we're exercising [Section 2.6.B], . . . I don't think we could stop them.'" Appellant's Br. 27, quoting J.A. 328.

## B.    Excusal of Performance

Process America next argues that, even if the solicitation of merchants would ordinarily be a breach of the non-solicitation clause, it is excused from performing its obligations under that provision as a result of Cynergy's failure to pay Process America residuals. We reject that argument.[5]

Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach. *See Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y.2d 88, 96 n.9 (1974). Whether a failure to perform constitutes a "material breach" turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the

---

[5] Cynergy argues that this argument is waived because Process America failed to raise it before the district court. We disagree. Although the issue was raised in a portion of Process America's opening brief relating to a tortious interference claim, Process America expressly argued that: "[D]ue to Cynergy's wrongful withholding of Process America's residuals, Process America was entitled to solicit merchants and did not breach the ISO Agreement for any merchant solicitations. In fact, merchant solicitation is considered damage mitigation for which Cynergy is liable." No. 12-cv-772, Doc. No. 126 at 33-34 (citations omitted). Process America also raised the issue in its reply brief. Furthermore, the district court considered, and rejected, this argument on the merits.

contract. *Id.* For a breach to be material, it must "go to the root of the agreement between the parties." *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989); *see also Callanan v. Powers*, 199 N.Y. 268, 284 (1910) ("[Rescission] is not permitted for a slight, casual, or technical breach, but, as a general rule, only for such as are material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract."); *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 287-89 (2d Cir. 1997).

A partial breach may entitle the non-breaching party to damages for the breach, but does not entitle the party to simply to treat the contract as at an end. *See, e.g.*, *Lovink v. Guilford Mills, Inc.*, 878 F.2d 584, 586 (2d Cir. 1989). "'A partial breach by one party . . . does not justify the other party's subsequent failure to perform; both parties may be guilty of breaches, each having a right to damages.'" *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117-18 (2d Cir. 2006), quoting 4 Corbin on Contracts § 946, at 811 (1951).

Process America argues that Cynergy's failure to pay residuals constitutes a material breach that excuses it from its obligation not to solicit merchants. The non-solicitation clause, however, survives for a period of five years post-

termination, regardless of how the contract was terminated. Moreover, although the failure to pay an agent may go to the "root" of the contract and could excuse the agent from *continuing* to work for the principal, Cynergy's breach occurred after a lengthy period of performance and the non-solicitation clause is a prohibition rather than an affirmative obligation on Process America. Under those circumstances, Cynergy's failure to pay residuals is not so significant as to constitute a material breach. Furthermore, Section 6.4 of the ISO Agreement explicitly states that Process America is not entitled to residuals if Cynergy terminates the ISO Agreement due to Process America's material breach. Thus, the ISO Agreement explicitly contemplates the situation that occurred here – Cynergy's unilateral withholding of residual payments. It is true that, as the district court found, Cynergy was not entitled to do so under the particular circumstances. Nonetheless, Cynergy's attempt to exercise an express contractual right does not constitute a material breach of the contract that would excuse non-performance of a separate obligation.

Process America attempts to connect the non-solicitation and continued compensation provisions by arguing that the obligation to pay residuals and the obligation not to solicit merchants are the only duties that survive termination

and therefore necessarily show mutuality. But the agreement to perform certain

duties post-termination is part of the bargained-for exchange embodied in the

contract as a whole and cannot be viewed in isolation. The mere fact that both

provisions survive termination does not make them contingent on each other.

C. **Damages Cap**

Process America also contends that the district court erred both in

interpreting the limitation on Cynergy's damages contained in the ISO

Agreement and in concluding, at the summary judgment stage, that the carve-out

for willful misconduct did not apply. Section 4.6 of the ISO Agreement provides

that:

> Except for the liability arising from gross negligence,
> recklessness, or willful misconduct, the total cumulative
> liability of Cynergy Data in the aggregate for damages
> arising from any breach of this Agreement or for any
> other claims under this Agreement, shall not exceed . . .
> fees derived by Cynergy Data . . . during the last 4
> months of this Agreement [which equals $300,818].

J.A. 208. The district court found, and we agree, that the plain language of

Section 4.6 limits damages for Cynergy's breach of contract to $300,818.

Process America argues that reading Section 4.6 to limit Cynergy's liability

would render Section 6.4 of the ISO Agreement superfluous. That argument fails.

24

Section 6.4 simply provides that termination of the ISO Agreement will not affect Process America's right to receive residuals, unless Cynergy terminates the ISO Agreement "due to a material breach of the Agreement by [Process America]." J.A. 210. But, as the district court observed, Section 6.4 says nothing about damages; it merely establishes a substantive right (to continue receiving residuals) for Process America. There is no contradiction between the two provisions and thus no need to "harmonize" them, which, in Process America's view, would require us to simply ignore Section 4.6. We note that the interplay between those two provisions does give Cynergy an incentive to stop paying residuals where the payments owed would exceed the damages cap. But that is the contract that the parties bargained for, and to the extent that Cynergy's decision to withhold residuals constituted willful misconduct, the damages cap would not apply.

Process America also contends that the district court erred in determining, following a motion *in limine*, that Cynergy's withholding of residuals was *not* "gross negligence, recklessness, or willful misconduct," J.A. 210, such that the damages cap does not apply. Process America argues that it set forth sufficient evidence of "willful misconduct" as to require a trial on that issue.

New York courts have routinely enforced liability-limitation provisions when contracted by sophisticated parties, recognizing such clauses as a means of allocating economic risk in the event that a contract is not fully performed.[6] *See, e.g., Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 822 (2014); *Peluso v. Tauscher Cronacher Prof'l Eng'rs, P.C.*, 704 N.Y.S.2d 289, 290 (App. Div. 2nd Dep't 2000); *Scott v. Palermo*, 649 N.Y.S.2d 289, 290-91 (App. Div. 4th Dep't 1996). In interpreting an exculpatory clause similar to Section 4.6, the New York Court of Appeals stated:

> In excepting willful acts from defendant's general immunity from liability . . . we think the parties intended to narrowly exclude from protection truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self- interest. . . . We, therefore, conclude that the term willful acts as used in this contract was intended by the parties to subsume conduct which is tortious in nature, i.e., wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties.

---

[6] Process America suggests that it was not a "sophisticated" party because it was new to the merchant services industry and was unrepresented when it signed the ISO Agreement. Even assuming that Process America was unrepresented, Process America remains a "sophisticated" entity as the term is used in this context. Business entities negotiating in a commercial setting do not warrant any special solicitude as "unsophisticated" parties simply because they are new to a particular industry and choose to forego representation by counsel.

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 438 (1994). The Court of Appeals then observed that where repudiation of a contract was "motivated exclusively by . . . economic self-interest," there was insufficient proof of any intent to "inflict harm." *Id.* at 439. Nonetheless, in interpreting exculpatory clauses, courts should "endeavor to give the contract construction most equitable to both parties" as "[l]anguage in contracts placing one party at the mercy of the other is not favored by the courts." *Id.* at 438 (alterations and internal quotation marks omitted).

At least one appellate court in New York has since clarified that "economic self-interest" is not an "excuse [for] all manner of misconduct," as "[e]conomic self-interest is the motivation for fraud, self-dealing and breach of fiduciary duty." *Banc of Am. Sec. LLC v. Solow Bldg. Co. II*, 847 N.Y.S.2d 49, 55 (App. Div. 1st Dep't 2007) (citations omitted). Applying that principle to a case where a landlord refused to review proposed modifications in order to extort a $6 million payment from the plaintiff, the court indicated that misconduct that "extends well beyond a simple breach of" contract may be excluded from an exculpatory

27

provision. *Id.* at 56.[7]

Even applying the more lenient definition of "willful misconduct" from *Solow*, the district court did not err in holding that Process America failed to submit sufficient evidence as to whether Cynergy's breach was willful. Because the ISO Agreement permitted Cynergy to terminate the ISO Agreement and withhold residuals for certain breaches, to show that Cynergy's conduct was anything more than a right specifically reserved to it under the contract, Process America must set forth some evidence that Cynergy did not believe it was justified in terminating the Agreement, rendering Cynergy's conduct – even if falling below the level of "tortious" – wrongful. Before turning to Process America's evidence of willfulness, we discuss briefly the evidence relevant to Cynergy's assessment of whether Process America had, in fact, breached the contract by maintaining a merchant reserve in violation of the Rules.

---

[7] The district court, as have other courts in this Circuit, treated *Solow* as inconsistent with *Noble Lowndes*, at least insofar as *Solow* suggested that an intentional breach, without more, could result in the non-enforcement of an exculpatory clause. S.A. 17; *see also Five Star Dev. Resort Cmtys., LLC v. iStar RC Paradise Valley, LLC*, No. 09 Civ. 2085, 2012 WL 4119561, at *5 (S.D.N.Y. Sept. 18, 2012). We need not resolve any potential conflict between *Solow* and *Lowndes*, however, because *Solow* provides little support for Process America's argument that Cynergy's breach was willful.

The district court concluded that CRIP, as a merchant reserve, was a material breach of contract, but did not justify Cynergy's termination of the contract without notice. The court therefore concluded that Cynergy's breach resulted solely from its failure to give notice and an opportunity to cure, which the district court described as "technical" in nature. S.A. 17. We do not reach the question of whether CRIP was a material breach of contract in this opinion. But, even assuming that the district court erred in granting summary judgment because there was a question of fact as to whether CRIP was funded out of Process America's own residuals, Cynergy would certainly be entitled to believe that CRIP involved a merchant reserve. The form Process America used to sign merchants up for CRIP is entitled "Merchant Reserve Acknowledgment" and describes the money used to fund CRIP as a "reserve," J.A. 1743.[8] Moreover, it is clear that Moneris considered CRIP to be a merchant reserve. Therefore, whether or not there was a material breach, the undisputed facts show that Cynergy would have been justified in believing one had occurred.

---

[8] We note that while the forms were unambiguous in describing CRIP as a merchant reserve, the question at issue in determining whether CRIP was a material breach of contract is not how Process America described the program in its contracts with merchants, but rather how Process America actually funded it. The enrollment contracts are not necessarily dispositive in that regard.

Process America identifies the following as the principal evidence of willfulness: (1) evidence that Old Cynergy was aware of CRIP and Cynergy later denied knowledge of CRIP in its communications with Moneris; (2) the delay between Cynergy's receipt of the letter from Moneris regarding CRIP and when Cynergy informed Process America that CRIP was a material breach; (3) an email exchange in which Cynergy executives sought to "intercept" merchants severing their contracts with Cynergy, J.A. 2635; and (4) a sworn statement from Alyssa B. Klausner, Process America's attorney, that Cynergy's General Counsel stated that the reason for withholding residuals was to "break" Process America. J.A. 2598-99.

None of this evidence is sufficient to raise a triable question of fact as to whether Cynergy's conduct "extend[ed] *well* beyond a simple breach of the [contract]," *Solow*, 847 N.Y.S.2d at 56 (emphasis added), let alone evidence that Cynergy "willfully intend[ed] to inflict harm on [Process America] at least in part through the means of breaching the contract between the parties." *Noble Lowndes*, 84 N.Y. at 438. Evidence that Cynergy knew about CRIP prior to termination, and later concealed its knowledge from Moneris, does not suggest that Cynergy did not believe it was justified in terminating the contract because of CRIP,

particularly as the event precipitating the termination was a letter from Moneris to Cynergy describing CRIP as a merchant reserve and requesting that Cynergy terminate Process America as an ISO. The fact that Cynergy waited a month after receiving the letter before informing Process America of the termination is similarly irrelevant.

The internal email in which Cynergy sought to "intercept" merchants canceling their contract, sent just weeks after Cynergy terminated the contract, also fails to support Process America's position. In that email, Cynergy's Chief Operating Officer instructed Cynergy personnel in the retention department:

> Take a look at all [Process America] cancels for the last 3 months and see if any good ones got away. We cancelled [Process America's] contract and are holding their residuals so it's likely they will move a lot of accounts. Let's try to intercept them if we can. Once they cancel . . . it's open game.

J.A. 2635. But that email was in response to a message from a Cynergy employee stating that Process America had told a merchant that Cynergy was "bankrupt" and "stealing money" from the merchant reserves. J.A. 2636. In that context, no misfeasance can be inferred from the COO's instruction to Cynergy personnel to "intercept" merchants canceling accounts with Cynergy who may have been told false things about Cynergy's business practices and financial stability.

31

The only evidence that Process America set forth that would suggest that Cynergy did *not* believe it was entitled to cancel the contract is an oral statement, relayed in a sworn affidavit by Klausner, that Cynergy was withholding reserves to "break" Process America. With respect to that statement, the affidavit states in full:

> I continued to negotiate with Ms. Corvino [Cynergy's General Counsel] in the [months after termination] to resolve the dispute between Cynergy and Process America regarding whether CRIP was a breach and under what circumstances Cynergy would pay the residuals that it was improperly withholding from Process America. It became clear that [Cynergy] was intent on permanently disrupting Process America's ability to do business and Ms. Corvino went as far as to admit to me that she and [Cynergy] were withholding the residuals from Process America in order to "break" Process America.

J.A. 2598-99. The affidavit fails to describe the context in which the statement was made, and quotes only a single word from the original statement. The only indication that Cynergy was withholding residuals for any improper reason is Klausner's speculation as to Cynergy's motives, which is insufficient to raise a triable issue of fact. *See, e.g., Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 141 (2d Cir. 1991) ("We have not hesitated to affirm a

summary judgment when the only proof proffered in opposition amounts to nothing more than speculation and conjecture.").

Because Process America failed to provide any evidence that would raise a genuine issue of material fact as to Cynergy's basis for terminating the contract, we agree with the district court that the carve-out in Section 4.6 for willful misconduct does not apply.

## II. Calculation of Damages

The district court held a bench trial limited solely to the issue of damages. When reviewing a judgment following a bench trial, we review a district court's findings of fact for clear error and its conclusions of law de novo. *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014). Under the clearly erroneous standard, "the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). "We are not allowed to second-guess the court's credibility assessments," and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (internal quotation marks omitted).

33

Process America challenges the district court's damages award principally on two separate grounds. First, it contends that Cynergy failed to meet its burden at trial to provide a stable foundation for its damages claim. Second, it argues that the district court failed to reduce the award by the improperly withheld residuals. We consider each argument in turn.

### A.    Proof of Damages

Proof of damages is an essential element of a claim for breach of contract under New York law. *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). A non-breaching party "is entitled, as a matter of law, to recover market value damages to the extent that they can be proven with reasonable certainty." *Schonfeld v. Hilliard*, 218 F.3d 164, 182 (2d Cir. 2000). Where, however, the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, "the burden of uncertainty as to the amount of damage is upon the wrongdoer." *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977); *see also Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 110 (2d Cir. 2007). Doubts are generally resolved against the party in breach. *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992). Therefore, a plaintiff need only show a "stable foundation for a reasonable

estimate" of the damages incurred as a result of the breach. *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383 (1974). At that point, the burden of any uncertainty as to the amount of damages is on the breaching party. *See Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 392 (2d Cir. 2006).

Process America argues that Cynergy failed to meet this burden at trial because Cynergy's expert relied on flawed methodology and Cynergy failed to prove that Process America's solicitation caused merchants to terminate their contracts with Cynergy. Crediting the testimony of Cynergy's expert, the district court rejected these arguments. The district court calculated damages by comparing a normal attrition rate – the rate at which merchants ceased using Cynergy's services – to the post-solicitation attrition rate, and revenue generated by the Portfolio before and after Process America's solicitation. The district court found that Process America solicited at least 214 of the 805 merchants in the Portfolio; that solicitation was the cause of the increased attrition rate; and that Cynergy was entitled to damages calculated by comparing the attrition rate pre- and post-solicitation. We can find no clear error in the district court's factual findings.

With respect to methodological errors, Process America primarily argues that the testimony of Cynergy's expert, Raymond Sobzcyk, was flawed because it relied on a six-month period for determining a normal attrition rate for Cynergy rather than a twelve-month period. Sobzcyk, however, testified that six months was the "relevant" period, J.A. 2864, and Process America identifies no evidence, as distinguished from its own briefing, that would indicate that reliance on a twelve-month is required to calculate a normalized attrition rate.[9]

Process America also contends that Cynergy failed to show by a preponderance of the evidence that solicitation caused the increased rate of attrition. At trial, both Sobczyk and Process America's expert testified regarding causation. Sobcyzk testified that, although it is "very difficult to isolate cause of attrition without a first-level kind of inquiry to the merchant," J.A.

---

[9] Process America argues that, had a twelve-month period been used, the normalized attrition rate would have been 55% (rather than the six-month rate of 16%), compared to the post-termination attrition rate of 79%. That twelve-month period, however, includes a review of merchant accounts by Cynergy's new management following Old Cynergy's bankruptcy and sale that resulted in the closure of a number of merchant accounts, and thus may be unreliable. We further observe that Sobczyk's expert report appears to have used a nine-month period for calculating the attrition rate, and found that the attrition rate was still 16% over that period.

2809,[10] he knew "of no other factors that would cause abnormal attrition in the [P]ortfolio" following termination. J.A. 2814. Cynergy's COO testified that there was no increase in customer service calls following termination. The district court credited that testimony, and found, in light of that testimony and the high attrition rate, that Cynergy had met its burden in showing the "fact of damages," S.A. 5, as a result of Process America's solicitation. Giving appropriate deference to the district court's credibility findings and weighing of the evidence, that finding was not clearly erroneous.

Having concluded that Cynergy met its burden in showing the fact of damages, doubts as to the amount of damages are resolved against the breaching party. Acknowledging that it was unlikely that the entire increase in attrition was, as a practical matter, due to Process America's actions, the district court nonetheless found that Process America had failed to show that any attrition was caused by some other factor. That finding is also not clearly erroneous.

Process America's expert, Adam Atlas, identified a number of other factors that could have resulted in increased attrition. For example, he suggested that if

---

[10] Neither Sobczyk, nor Process America's expert witness, attempted to survey the merchants who terminated their contracts with Cynergy to determine the cause. Sobczyk suggested that such surveys can be unreliable.

37

Cynergy had rebranded the statements going out to merchants, merchants could have chosen to switch processors. Atlas conceded, however, that he did not know if Cynergy had actually changed its branding and was not aware of any merchant that canceled its contract with Cynergy for that reason. He also testified that that attrition may have occurred because "[t]he service to the merchants very likely declined in quality because Cynergy Data acquired the portfolio for free and therefore didn't need to work hard to earn it or keep it." J.A. 3557. Atlas conceded again, however, that he had no knowledge of whether Cynergy's customer service had, in fact, decreased in quality, and this speculation is inconsistent with the testimony credited by the district court that customer service calls did not increase. Furthermore, neither Atlas, nor any other Process America witness, provided any alternative damages calculation apart from suggesting that *no* damages could be attributed to Process America's solicitation. In short, none of the evidence proffered by Process America at trial or identified on appeal casts doubt on the district court's factual findings.

Accordingly, we affirm the district court's damages calculation to the extent that it attributes 100% of the increased attrition to Process America.

### B. Improperly-Withheld Residuals

Process America also contends that the damages calculation was erroneous because it improperly included residuals that would have been paid to Process America. We agree.

"Although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law." *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991) (internal quotation marks omitted). "[D]amages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003). "In implementing this general rule, we have stated that when computing damages for a defendant's wrongful conduct, 'if any benefit or opportunity for benefit appears to have accrued to the plaintiff because of the breach, a balance must be struck between benefit and loss, and the defendant is only chargeable with the net loss.'" *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995), quoting *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852 (2d Cir. 1987). Therefore, "revenues due a plaintiff because of a breached contract must be offset by any amount plaintiff saved as a result of the

breach," including fixed and variable costs. *Id.*

The damages calculation set forth by Sobczyk, and adopted by the district court, assumed that Cynergy was entitled to retain Process America's residuals. That assumption contradicts the district court's unchallenged summary judgment ruling that Cynergy was not entitled to withhold residuals because of CRIP, which Cynergy maintains was the basis for the termination of the ISO Agreement. Cynergy's damages award must therefore account for the compensation that should have been, but was not, paid to Process America. To hold otherwise would put Cynergy in a *better* position than if the contract was performed: rather than simply allowing Cynergy to recover its expected profit on the contract, it would allow Cynergy to recover expected net revenue without accounting for costs that would have been paid had the contract been fully performed. The withholding of residuals is thus a "benefit . . . [that has] accrued to [Cynergy] because of the breach," and any "revenues due [to Cynergy] . . . must be offset by any amount [Cynergy] saved as a result of the breach," *id.*

Our conclusion here does not contradict Section 4.6's damages cap. That cap limits only the amount of money that Cynergy may be required to pay as damages for its *own* breach of contract. It does not, however, abrogate the basic

rule of contract law that a party should receive as damages the expected value – including lost benefits offset by saved costs – of the contract if fully performed. We acknowledge that our conclusion has an *effect* similar to that of ignoring the damages cap; however, that is solely due to the nature of Cynergy's specific breach, which essentially consisted of withholding compensation that should have been paid (and thus saving costs), rather than to an interpretation of the contract to exclude the damages cap.

In response, Cynergy argues that, even if it was not permitted to withhold residuals because of CRIP, Process America's post-termination solicitation of merchants constitutes a second material breach that vitiates Process America's right to residuals and thus would support the district court's damages award. We disagree.

Section 6.4 requires Cynergy to continue paying Process America residuals "unless the Agreement is *terminated* by Cynergy Data *due to* a material breach of the Agreement by [Process America]." J.A. 210 (emphasis added). The unambiguous language of the contract thus provides that Cynergy may withhold residuals *only* where the material breach itself caused the termination. Cynergy itself describes Process America's solicitation as occurring *post*-termination, *see*

41

Appellee's Br. 32, which – by definition – means that Cynergy did not "terminate" the ISO Agreement because of improper post-termination solicitation. Furthermore, as Cynergy repeatedly argued below and on appeal, it terminated the ISO Agreement because of CRIP – not because of solicitation. Thus, if Cynergy was not entitled to withhold residuals because of CRIP (as the district court held), Process America's solicitation cannot provide a separate basis for doing so.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's interim decisions regarding Process America's liability. With respect to the district court's calculation of damages, we VACATE the district court's judgment and REMAND for further proceedings consistent with this opinion.