16-3923(L)
*ING Bank N.V. v. M/V TEMARA*

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term 2017

_____

Nos. 16-3923(L), 16-4019(Con)

(Argued: March 15, 2018; Decided: June 13, 2018)

ING Bank N.V.,
*Plaintiff-Intervenor-Defendant-Appellant,*

*v.*

M/V TEMARA, IMO No. 9333929, her engines, tackle, equipment, furniture, appurtenances, etc., *in rem*,
*Defendant-Intervenor-Defendant-Appellee,*

CEPSA International B.V.,
*Intervenor-Plaintiff-Appellant,*

CEPSA Panama, S.A.,
*Intervenor-Plaintiff,*

O.W. Bunker & Trading A/S, *in personam*,
*Intervenor-Defendant.*[1]

_____

Appeal from the United States District Court
for the Southern District of New York
Katherine B. Forrest, District Judge, Presiding.

---

[1] The Clerk of Court is respectfully directed to amend the caption as above.

Before:  PARKER, WESLEY, and LIVINGSTON, *Circuit Judges.*

————

The assignee of a maritime fuel contract supplier and the physical supplier assert competing maritime lien claims arising from the delivery of fuel to a vessel.  To effect actual delivery of the fuel, the contract supplier subcontracted with an intermediary, who re-subcontracted with the physical supplier.  After delivery of the fuel but before any party received payment, the contract supplier and the intermediary declared bankruptcy.  Both the assignee of the contract supplier and the physical supplier asserted maritime liens for the unpaid fuel against the vessel.  The District Court denied both maritime liens and *sua sponte* entered summary judgment in favor of the vessel.  The assignee of the contract supplier and the physical supplier appealed.  We **AFFIRM IN PART**, **VACATE IN PART**, and **REMAND** for further proceedings consistent with this opinion.

————

J. STEPHEN SIMMS AND CASEY L. BRYANT, Simms Showers LLP, Baltimore, MD., *for CEPSA International B.V.*

JAMES D. BERCAW AND ROBERT J. STEFANI, King, Krebs & Jurgens, PLLC, New Orleans, LA, and BRUCE G. PAULSON AND BRIAN P. MALONEY, Seward & Kissel LLP, New York, N.Y., *for ING Bank N.V.*

JAMES H. POWER AND MARIE E. LARSEN, Holland & Knight LLP, New York, N.Y., *for M/V TEMARA, IMO No. 9333929, her engines, tackle, equipment, furniture, appurtenances, etc.*

————

BARRINGTON D. PARKER, *Circuit Judge:*

This appeal requires us to decide which parties are entitled to a maritime lien under the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.*

In 2014, the charterer of a vessel contracted with a supplier to buy bunkers (marine fuel). To fulfill its obligation, the contract supplier subcontracted with an intermediary, who, in turn, subcontracted with another entity, the physical supplier, who then delivered the bunkers. After the bunkers were delivered, but before anyone was paid, the contract supplier and the intermediary entered bankruptcy. In order to get paid, the assignee of the contract supplier and the physical supplier asserted competing maritime liens against the vessel. We must decide which party was entitled to do so.

The assignee of the contract supplier and the physical supplier cross-moved for summary judgment. The United States District Court for the Southern District of New York (Katherine B. Forrest, *Judge*) concluded that neither the contract supplier (and, thus, its assignee) nor the physical supplier were entitled under CIMLA to maritime liens and denied their motions for summary

3

judgment. Without providing notice to the parties, the District Court then *sua sponte* entered summary judgment in favor of the vessel.

We affirm in part, vacate in part, and remand for further proceedings. We agree with the District Court that the subcontractor physical supplier was not entitled to a maritime lien because it did not provide the bunkers on the order of an entity specified in CIMLA. However, we disagree with the District Court that the bunker contract supplier—and, thus, its assignee—was not entitled to seek a maritime lien. A contractor is entitled to assert a maritime lien under CIMLA when it contracts with an entity specified in the statute for the delivery of necessaries and those necessaries are delivered pursuant to that arrangement, even if by a subcontractor. We also conclude that the District Court's *sua sponte* entry of summary judgment was error.

## BACKGROUND[2]

This appeal flows from the collapse of O.W. Bunker and Trading A/S ("O.W. Denmark") and its international subsidiaries (collectively with its international subsidiaries, the "O.W. Bunker Group"), a world-wide operation which was in the business of supplying bunkers to ships operating in

---

[2] "JA" refers to the parties' joint appendix. "SA" refers to ING's supplemental appendix.

4

international commerce. Following the collapse of the O.W. Bunker Group, many of its customers were unsure where to direct payment and, because they faced competing claims from various unpaid parties, those customers were concerned that their vessels would be subject to arrest while the payment issues were sorted out.

CIMLA provides to a specific class of creditors a special type of statutory lien—a maritime lien—as security for a discrete category of debts. Under CIMLA, a party who provides necessaries (such as bunkers) to a vessel is entitled to assert a maritime lien. 46 U.S.C. § 31342. A maritime lien grants a provider of necessaries a suite of powerful rights: the right to arrest the vessel, to have it sold, and to be paid from the proceeds. Maritime liens promote maritime commerce by providing additional recourse—beyond *in personam* claims against counterparties—by enabling the assertion of a lien directly against the vessel, thereby encouraging the prompt payment of debts and the existence of a reliable market for the servicing and supplying of vessels, which are obviously essential to maritime commerce. Unpaid entities who have supplied necessaries but who do not qualify for maritime liens may have *in personam* claims. However, due to

the complexities of international maritime commerce, collection on these claims can be considerably more problematic than is the case with maritime liens.

The relevant chain of events began in October 2014 when Copenship Bulkers A/S ("Copenship"), the time-charterer of the M/V TEMARA (the "TEMARA," or the "Vessel"), contracted with a contract supplier, O.W. Denmark, for the delivery of 400 metric tons of bunkers to the Vessel in Balboa, Panama. After receiving the order, O.W. Denmark issued a sales order to Copenship confirming the details of the sale. The confirmation lists O.W. Denmark as the "seller," Copenship as the "buyer," and CEPSA International B.V. ("CEPSA")[3] as the "supplier." The confirmation provided that "acceptance of the marine bunkers by the vessel . . . shall be deemed to constitute acceptance of the said general terms[.]" The confirmation reflected the agreed-upon price for the fuel—$536.00 per metric ton—and specified that payment would be due 30 days after delivery. The sales agreement between O.W. Denmark and the charterer was governed by the "OW Bunker Group Terms and Conditions of sale

---

[3] CEPSA Panama, S.A. originally filed the intervenor complaint, but the District Court determined that the real party-in-interest was CEPSA International B.V.

6

[sic] for Marine Bunkers Edition 2013" (the "O.W. Terms").  JA at 103–14.  Clause

L.4(a) of the O.W. Terms ("Clause L.4(a)") made them fluid by providing that:

> These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions. In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.

*Id.* at 111.

In the next step of the transaction, O.W. Denmark subcontracted with its subsidiary, O.W. USA, for the purchase of the bunkers.  O.W. USA issued a sales order confirmation to O.W. Denmark, listing O.W. Denmark as the "buyer" and O.W. USA as the "seller."  The confirmation reflected a price of $529.00 per metric ton and called for payment within 30 days of delivery.[4]

---

[4] Notably, ING failed to present the actual contract constituting this link in the contractual chain to the District Court on its motion for summary judgment; it only presented the actual contract as part of its motion for reconsideration, which the District Court declined to consider when it denied the motion. *See* Order, *ING Bank N.V. v. M/V TEMARA*, No. 16-cv-95 (S.D.N.Y. Nov. 28, 2016), ECF Dkt. 181.

7

In the third and final stage of the transaction, O.W. USA subcontracted with the physical supplier, CEPSA, for the actual delivery of the bunkers. CEPSA issued a confirmation to O.W. USA listing CEPSA as the "seller," O.W. USA as the "buyer," and reflecting a price of $526.00 per metric ton. O.W. USA then memorialized the transaction in its own confirmation. Neither confirmation referenced O.W. Denmark or the charterer of the Vessel, but both referenced the Vessel. CEPSA physically supplied the bunkers to the Vessel and CEPSA provided a bunker receipt that the Vessel's chief engineer signed and stamped with the names of the Vessel and its owner.

Following delivery of the bunkers, each party in the contractual chain invoiced its respective counterparty, at different prices, reflecting a markup at each stage of the transaction: O.W. Denmark invoiced the charterer, Copenship, JA at 115 ($536 per metric ton); O.W. USA invoiced O.W. Denmark, JA at 130 ($529 per metric ton); and CEPSA invoiced O.W. USA, JA at 90 ($526 per metric ton). As the invoices came due, O.W. Denmark entered insolvency proceedings in Denmark, the O.W. Bunker Group collapsed, and the various O.W. Bunker Group entities then entered insolvency proceedings around the world.

8

In December 2013, almost a year before the O.W. Bunker Group's collapse, ING Bank N.V. ("ING") and O.W. Denmark entered into a $700 million revolving credit agreement, funded by a syndicate of lenders, which provided working capital for the O.W. Bunker Group. ING contends that the credit agreement was secured by, among other things, an assignment of O.W. Bunker Group receivables from the bunker transactions it had conducted—including the right to payment for the bunkers delivered to the Vessel. No one has received payment for those bunkers.

In May 2015, ING, as assignee of O.W. Denmark, filed a complaint *in rem* against the Vessel in the United States District Court for the District of Maryland, asserting a maritime lien against the Vessel for the bunkers delivered by CEPSA. ING moved for a warrant of arrest, and the Vessel was then arrested in Baltimore, Maryland. A few days later, CEPSA, intervened to assert a competing maritime lien claim and an *in personam* breach of contract claim against ING. To secure the release of the Vessel pending the adjudication of the competing claims, its owner posted security, and the vessel was released.

In September 2015, ING moved for partial summary judgment on its lien claim and on CEPSA's claims and CEPSA cross-moved for summary judgment. In January 2016, as these motions were still pending, the case was transferred to the Southern District of New York. By June 2016, several other actions arising out of the collapse of the O.W. Bunker Group involving similar claims were pending before the District Court. The District Court entered an order coordinating them, and among other things, directed ING to move for partial summary judgment to test the validity of its maritime lien.

Initially, the District Court considered CEPSA's entitlement to a maritime lien. The District Court granted ING's motion for summary judgment, dismissed CEPSA's maritime lien claim and denied its cross-motion for summary judgment. *See ING Bank N.V. v. M/V TEMARA*, 203 F. Supp. 3d 355 (S.D.N.Y 2016) (the "August 2016 Order").[5] Noting that CIMLA requires that a party asserting a maritime lien must have provided the necessaries upon the order of owner of the vessel or a person authorized by the owner, the District Court

---

[5] At the same time, the District Court issued opinions in other O.W. Bunker Group related matters, dismissing the physical suppliers' claims in those actions. *See Aegean Bunkering (USA) LLC v. M/T AMAZON*, No. 14-cv-9447, 2016 WL 4471895 (S.D.N.Y. Aug. 24, 2016); Order, *O'Rourke Marine Servs. L.P., LLP v. M/V COSCO HAIFA*, No. 15-cv-2992 (S.D.N.Y. Aug. 24, 2016), ECF Dkt. 103.

10

determined that CEPSA was not entitled to a maritime lien because it provided the bunkers on the order of O.W. USA, an intermediary who was neither an owner nor the authorized agent of the owner. *See id.* at 365. The District Court also dismissed CEPSA's alternative claim that it was entitled to recover on a theory of unjust enrichment and on equitable principles, reasoning that because maritime liens are creations of CIMLA whose terms are strictly construed, generalized equitable concerns do not trump the express provisions of the statute.

Turning to ING's (as assignee of O.W. Denmark) assertion of a maritime lien, the District Court concluded that O.W. Denmark had not "provided" necessaries to the Vessel within the meaning of CIMLA and thus could not assert a maritime lien. The District Court found that there was a lack of evidence with respect to O.W. Denmark's "arrangements down the chain" and that O.W. Denmark could not, without proof of a fully intact contractual chain, be deemed to have provided necessaries as required by CIMLA. *See ING Bank, N.V. v. M/V TEMARA*, No. 16-cv-95, 2016 WL 6156320, at *8 (S.D.N.Y. Oct. 21, 2016) (the "October 2016 Order"). In other words, the District Court concluded that the

11

record was uncertain as to how financial obligations and terms and conditions moved down the chain from O.W. Denmark, the contract supplier, to CEPSA, the physical supplier (through the intermediary, O.W. USA). Based on this view of the record, the District Court reasoned that O.W. Denmark did not take on any risk—financially or in terms of necessaries provided—in connection with the provision of bunkers to the Vessel since "it never assumed title or possession of the bunkers, it never obligated itself to pay the actual physical supplier, and it never supplied the bunkers." *See id.* at *3. Concluding that a provider of necessaries must have taken on some risk in the transaction, the District Court denied O.W. Denmark's claim for a maritime lien because it was "steps removed from the physical provision of bunkers and never . . . had a tangible financial risk with regard to them[.]" *See id.* at *6; *id.* at *7 ("The case law does not support awarding a maritime lien in a non-risk—and therefore non-protective—circumstance.").

After denying ING's motion for partial summary judgment, the District Court *sua sponte*—and without giving ING notice or an opportunity to respond—entered summary judgment against ING and in favor of the Vessel,

even though the Vessel had not moved for summary judgment. Subsequently, ING moved for reconsideration and sought to supplement that factual record with additional information in order to complete the contractual links missing from its original motion. The District Court denied the motion without entertaining further submissions or briefing. Order, *ING Bank N.V. v. M/V TEMARA*, No. 16-cv-95 (S.D.N.Y. Nov. 28, 2016), ECF Dkt. 181. This appeal followed.

**STANDARD OF REVIEW**

We review a district court's grant of summary judgment *de novo*. *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 133 (2d Cir. 2016). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). We construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *June v. Town of Westfield*, 370 F.3d 255, 257 (2d Cir. 2004).

**DISCUSSION**

A maritime lien is a "special property right in the vessel, arising in favor of the creditor by operation of law as security for a debt or claim," which "arises when the debt arises[.]" *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 982 F.2d 765, 766 (2d Cir. 1992) (quoting *Equilease Corp. v. M/V SAMPSON*, 793 F.2d 598, 602 (5th Cir. 1986) (en banc)).  Unlike other security arrangements, a maritime lien tends to benefit both the ship and its creditors.  "On the one hand, it enables ships to obtain repairs and supplies on its own account that might not otherwise be available." *Id.* at 768 (citing *Piedmont & Georges' Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 9 (1920)).  On the other hand, it endows the creditor with a "special property" in the ship that comes into existence when the debt arises and gives the creditor the right to have the ship sold so that the creditor's debt may be paid out of the proceeds of the sale.  *Id.* (quoting *The Poznan*, 9 F.2d 838, 842 (2d Cir. 1925), *rev'd on other grounds sub nom.*, *New York Dock Co. v. Steamship Poznan*, 274 U.S. 117 (1927)); *see also* Schoenbaum, Thomas, J., *Admiralty and Maritime Law* § 9-1, at 684 (5th ed. 2011); 2-II Benedict on Admiralty § 22 (2017).

CIMLA is the statutory basis for maritime liens. CIMLA provides that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel [and] may bring a civil action in rem to enforce the lien . . . ." 46 U.S.C. § 31342(a). Specifically, CIMLA requires three elements for a maritime lien: (1) that the goods or services at issue were "necessaries," (2) that the entity "provid[ed]" the necessaries to a vessel; and (3) that the entity provided the necessaries "on the order of the owner or a person authorized by the owner." *Id.; see Barcliff LLC v. M/V DEEP BLUE*, 876 F.3d 1063, 1068 (11th Cir. 2017). CIMLA defines "persons . . . presumed to have authority to procure necessaries for a vessel" as "(1) the owner; (2) the master; (3) a person entrusted with the management of the vessel at the port of supply; or (4) an officer or agent appointed by—(A) the owner; (B) a charterer; (C) an owner pro hac vice; or (D) an agreed buyer in possession of the vessel." 46 U.S.C. § 31341(a). "Necessaries" include, among other things, bunkers. *See Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*, 814 F.3d 146, 151 n.13 (2d Cir. 2016); *see also* 46 U.S.C. § 31301(4).

15

Maritime liens arise only by operation of law and not by contract. *Bominflot, Inc. v. The M/V HENRICH S*, 465 F.3d 144, 146 (4th Cir. 2006) ("[M]aritime liens are *stricti juris* and cannot be created by agreement between the parties; instead, they arise by operation of law[.]"); *accord Newell v. Norton*, 70 U.S. 257, 262 (1865) ("Maritime liens are not established by the agreement of the parties. . . . They are consequences attached by law to certain contracts, and are independent of any agreement between the parties that such liens shall exist."). Maritime liens are disfavored by the law, and are thus construed under the doctrine of *stricti juris*, meaning that the statutory requirements are construed strictly and may not be expanded by "construction, analogy or inference." *Itel Containers*, 982 F.2d at 768 (quoting *Piedmont*, 254 U.S. at 12). The primary purpose of maritime liens is to facilitate maritime commerce by reducing the counterparty risk associated with supplying a vessel that may not return to the same port again. Strict construction of CIMLA, among other things, is intended to prevent a proliferation of liens, something that might otherwise be a significant hindrance to maritime commerce. *See id.*

16

## A. Contract Supplier's Claims (O.W. Denmark)

Whether ING, as O.W. Denmark's purported assignee, is entitled to assert a maritime lien against the Vessel depends on whether O.W. Denmark is entitled to assert such a lien. The key to this inquiry is whether an entity such as O.W. Denmark which agreed to supply necessaries and then contracts with one or more intermediaries to supply them can itself be deemed to have "provided" necessaries under CIMLA. We conclude that the answer, guided by straightforward principles of contract law, is yes. A maritime lien may be asserted by an entity when that entity contracts with a vessel's owner, charterer, or other statutorily-authorized person for the provision of necessaries and the necessaries are supplied pursuant to that agreement even if by another party.

The Restatement (Second) of Contracts offers the following apt illustration: "A contracts to deliver to B coal of a specified kind and quality. A delegates the performance of this duty to C, who tenders to B coal of specified kind and quality. The tender has the effect of a tender by A." Restatement (Second) of Contracts § 318 cmt. a., illus. 2 (Am. Law Inst. 1981). In other words, a supplier may provide necessaries to a vessel indirectly through a subcontractor because

17

when a subcontractor does so pursuant to its contract with a contractor, the subcontractor's performance is attributable to the contractor. *See Galehead, Inc. v. M/V ANGLIA*, 183 F.3d 1242, 1245 (11th Cir. 1999) (observing that a contract supplier "'provided' necessaries to the vessel under the contract irrespective of how, or by whom, the delivery was carried out"); *see also Clearlake Shipping PTE Ltd. v. O.W. Bunker (Switzerland) SA*, 239 F. Supp. 3d 674, 691 (S.D.N.Y. 2017) (concluding that a contractor need not have supplied fuel to have a lien, so long as it, "through a chain of separate, but clearly documented transactions, caused its subcontractors to deliver the necessaries to the vessels"); *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 780 F. Supp. 191, 194 (S.D.N.Y. 1991).

That is what occurred here. O.W. Denmark agreed to supply bunkers to the Vessel on the order of Copenship, the charterer. O.W. Denmark then subcontracted its obligations to O.W. USA, which, in turn, subcontracted with CEPSA for the actual delivery of the bunkers and who in fact delivered the bunkers. Accordingly, we hold that O.W. Denmark was a provider of necessaries under CIMLA and may assert a maritime lien against the Vessel. *See also Barcliff*, 876 F.3d at 1074 (holding that an O.W. Bunker Group entity acting as a contract

18

supplier could assert a maritime lien against a vessel because it "provided the bunkers to the vessel within the meaning of § 31341(a)").

The District Court reached a different result. It concluded that O.W. Denmark, in subcontracting for the provision of the bunkers to the Vessel, did not "provide" the bunkers to the Vessel since it did not incur any financial risk down the contractual chain. *See* October 2016 Order, 2016 WL 6156320, at \*7 (observing that "if Party A subcontracts to Party B for bunkers for a vessel, and B subcontracts to C . . . in order for Party A to have a <u>maritime</u> lien . . . the contractual chain between A and C (or D) must be traceable and intact, ultimately placing A at financial risk for the bunkers provided" (alteration in original)). We disagree with this application of CIMLA. To assert a maritime lien, all a bunker contractor must establish is that it contracted with a statutorily-authorized person for the delivery of bunkers and that the bunkers were delivered pursuant to that contractual arrangement. Here, there is no question that the Vessel's charterer and O.W. Denmark entered into a contract to deliver bunkers to the Vessel. And, there is no question that those bunkers were

19

delivered pursuant to that arrangement. Thus, O.W. Denmark is entitled to assert a maritime lien under CIMLA.

The District Court's risk analysis was beside the point. In any event, the contractual chain in the record reflects routine commercial risk. Had O.W. USA (through CEPSA) failed to deliver, O.W. Denmark would have been liable to Copenship for the breach. O.W. Denmark bore the risk of O.W. USA's nonperformance (and, also, CEPSA's) and would have had to find an alternate bunker supplier if they failed to deliver. Moreover, O.W. Denmark would have had to pay O.W. USA even in the event that Copenship failed to pay it (and bankruptcy had not intervened). Insofar as the District Court determined that some additional proof of financial risk (over and above the contract itself) on the part of the bunker contractor was required, we conclude that such proof is not required by CIMLA.

Accordingly, we conclude that the District Court erred in denying ING's motion for partial summary judgment on its entitlement to a maritime lien.

**B.      Physical Supplier's Claims (CEPSA)**

CEPSA claimed that it is entitled to a maritime lien for the bunkers it supplied, or, in the alternative, that it is entitled to recovery based upon equitable principles, such as unjust enrichment.  We do not agree.  Because there is no dispute that CEPSA physically provided bunkers to the Vessel, "CEPSA's entitlement to a maritime lien turns on whether it furnished those bunkers 'on the order of the owner or a person authorized by the owner'"  August 2016 Order, 203 F. Supp. 3d at 364 (quoting 46 U.S.C. § 31342(a)).  We agree with the District Court that CEPSA, as a subcontractor, is not entitled to a maritime lien because it provided the bunkers at the direction of O.W. USA rather than at the direction of the owner or the charterer of the Vessel, or any other statutorily-authorized person.  It is a "long-recognized rule that the services of an independent subcontractor [generally] do not give rise to a maritime line."  1 Admiralty & Mar. Law § 9-3 (5th ed.)  Every circuit to have considered the issue agrees.  *See Barcliff*, 876 F.3d at 1071 ("Where the owner directs a general contractor to provide necessaries to its vessel, a subcontractor retained by the general contractor to . . . provide the supplies is generally not entitled to a

21

maritime line."); *Cianbro Corp. v. George H. Dean, Inc.*, 596 F.3d 10, 17 (1st Cir. 2010); *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 229 (5th Cir. 1999); *S.C. State Port Auth. v. M/V TYSON LYKES*, 67 F.3d 59, 61 (4th Cir. 1995); *Port of Portland v. M/V PARALLA*, 892 F.2d 825, 828 (9th Cir. 1989).

Despite the weight of authority to the contrary, CEPSA claims nevertheless that it is entitled to a maritime lien for the bunkers it supplied. Alternatively, CEPSA claims that it is entitled to recovery based upon equitable principles, such as unjust enrichment. We reject both of these arguments.

The District Court correctly concluded that there is no genuine dispute of material fact as to whether CEPSA provided the bunkers at the direction of O.W. USA. The record contained the sales order confirmation that CEPSA issued to O.W. USA and the purchase order confirmation that O.W. USA issued to CEPSA. On CEPSA's sales order confirmation, O.W. USA is listed as the "buyer" and CEPSA is listed as the "supplier." *See* JA at 65 (CEPSA sales order confirmation). O.W. USA's confirmation to CEPSA is to the same effect. *See id.* at 66 (O.W. USA purchase order confirmation). These documents indicate that CEPSA entered

into a bilateral transaction with O.W. USA and none of them indicate that O.W. USA was the owner of the Vessel or an agent of the owner or any other statutorily-authorized person. The nomination, confirmations of purchase and sale, and invoice all denominate O.W. USA as the "buyer" and CEPSA as the "seller." None of the pertinent documents refer to O.W. Denmark or the charterer. In other words, CEPSA points us to no credible evidence that the charterer of the Vessel agreed to be bound by O.W. USA's purchase of the bunkers.[6] *See Lake Charles Stevedores*, 199 F.3d at 229 (subcontracting suppliers "hired by those general contractors are generally not entitled to assert a lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance"). For these reasons, we agree with the District Court's conclusion that CEPSA was acting as a subcontractor of O.W. USA (which itself was a subcontractor of O.W.

---

[6] CEPSA's argument that the Vessel's chief engineer's signature or CEPSA's delivery receipt evidences a directive from the Vessel (or an authorized agent of the owner) fails to raise a genuine issue of material fact. Acknowledgment of delivery merely shows that the bunkers reached the ship and is merely evidence of "acceptance of performance under a pre-existing contract." *Clearlake*, 239 F. Supp. 3d at 689. A signature on a delivery receipt alone is not enough to show that the parties intended to alter in any way the established contractual chain well-documented by order confirmations and invoices.

Denmark) when it delivered the bunkers to the Vessel and is, therefore, not entitled to a maritime lien.[7]

Nor can CEPSA show that it was acting on the order of O.W. USA, as agent of the vessel owner. *See id.* at 229; *Marine Fuel Supply & Towing, Inc. v. M/V KEN LUCKY*, 869 F.2d 473, 477–78 (9th Cir. 1988). To resist this conclusion, CEPSA argues that the terms and conditions in its (bilateral) agreement with O.W. USA bind not just O.W. USA, but also the Vessel, the charterer, and O.W. Denmark (and ING, as O.W. Denmark's assignee). Specifically, CEPSA contends that the terms of the contract between CEPSA and O.W. USA apply to the Vessel through Clause L.4(a) of the O.W. Terms. In essence, CEPSA argues that, assuming those terms pass through to and apply to the Vessel, then the Vessel had knowledge of those terms and approved and accepted them, making any O.W. Bunker Group entity an agent of the Vessel such that CEPSA, in contracting with O.W. USA, provided the bunkers on the order of a statutorily-authorized person. This chain of contract argument fails because, as we have seen, maritime liens are solely

---

[7]     We also note, as the District Court cogently observed, that if we were to allow a subcontractor—without any indication that a statutorily-authorized entity provided direction—to assert a maritime lien, we would be subjecting vessels to arrest on the basis of disputes between contractors and their subcontractors, or in this case, a dispute between a subcontractor and a sub-subcontractor. *See* August 2016 Order, 203 F. Supp. 3d at 367.

24

creatures of statute. If a party does not comply with the express provisions of CIMLA, it is not entitled to a maritime lien. Generalized principles of contract law can not be used to work around those provisions. *See Itel Containers*, 982 F.2d at 768 (a maritime lien "aris[es] by operation of law . . . [and] is therefore *stricti juris*").

CEPSA's related agency argument fails as well. CEPSA contends that its terms and conditions pass up the contractual chain, and thus the O.W. Bunker Group entities (O.W. Denmark and O.W. USA) became its agents for the supply of the bunkers directly to the Vessel. In other words, the charterer (or the Vessel) ordered the bunkers directly from CEPSA through O.W. Denmark and O.W. USA. We are not persuaded. We see no support in the record for the proposition that either or both of O.W. Denmark and O.W. USA were acting as CEPSA's agent when (i) O.W. Denmark took the initial order for bunkers from the charterer of the Vessel, (ii) O.W. Denmark subcontracted with O.W. USA for delivery, and (iii) O.W. USA then sub-subcontracted with CEPSA. All we see is a series of counterparty transactions.

CEPSA also argues that since it supplied the bunkers, it is entitled to recovery from the Vessel on a theory of unjust enrichment. The District Court properly determined that CEPSA could not prevail on this theory. The District Court determined, and CEPSA confirms on appeal, that the only relief sought is a maritime lien against the Vessel *in rem*. But, as the District Court correctly determined, an unjust enrichment claim must be asserted *in personam*. Although unjust enrichment claims are available under maritime law as *in personam* claims, *Gulf Oil Trading Co. v. Creole Supply*, 596 F.2d 515, 519 (2d Cir. 1979), *in rem* maritime liens "cannot be conferred on the theory of unjust enrichment or subrogation." 2-II Benedict on Admiralty § 24 (2017); *see also Mullane v. Chambers*, 438 F.3d 132, 136 n.5 (1st Cir. 2006) (observing that the plaintiffs "mistakenly thought that their maritime lien theories could create equitable liens"); *The Eurana*, 1 F.2d 684, 686 (3d Cir. 1924) ("Maritime liens . . . cannot be conferred on the theory of unjust enrichment or subrogation.").

Finally, CEPSA's other equitable arguments also fail. Observing that equitable principles are "central" to admiralty law, CEPSA contends that it would be a "manifest injustice" to allow ING to recover the funds that are owed

26

CEPSA, the entity that provided the bunkers, in circumstances where ING delivered nothing and supposedly incurred no commercial risk or obligation. CEPSA Opening Br. at 24. While maritime law is indeed grounded in equity, we disagree that equitable principles mean that CEPSA is entitled to a *de facto* maritime lien under CIMLA when the statue unambiguously provides otherwise. As the District Court correctly observed, courts have consistently rejected the concept of an equitable maritime lien. *C.f. The Bird of Paradise*, 72 U.S. 545, 555 (1866); *O'Rourke Marine Servs. L.P., LLP v. M/V COSCO HAIFA*, 179 F. Supp. 3d 333, 336–37 (S.D.N.Y. 2016). We do as well because maritime liens are strictly creatures of statute and "cannot be extended argumentatively, or by analogy or inference." *Osaka Shosen Kaisha v. Pac. Exp. Lumber Co.*, 260 U.S. 490, 500 (1923).

We are not unsympathetic to CEPSA's position. After all, it supplied the bunkers and our conclusion means it gets no lien and very likely could find itself at the end of the day with an uncollectible receivable. But this result is a frequent one in insolvencies: an unsecured entity such as CEPSA, who took an unsecured credit risk, stands in line behind secured lenders.

**C.** *Sua Sponte* **Grant of Summary Judgment to Vessel**

Finally, we conclude that the District Court erred when it, *sua sponte*, granted summary judgment in favor of the Vessel. *See* October 2016 Order, 2016 WL 6156320, at \*9 (citing *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000)). Federal Rules of Civil Procedure 56(a) and 56(b)-(e) set out the procedures that apply when a party moves for summary judgment and when a district court decides a such a motion. But when a party does not move for summary judgment, Rule 56(f) controls and "provide[s] express procedures governing the grant of summary judgment independent of a motion." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 80 n.2 (2d Cir. 2014). Rule 56(f) provides:

> **Judgment Independent of the Motion.** After giving notice and a reasonable time to respond, the court may:
> (1) grant summary judgment for a nonmovant;
> (2) grant the motion on grounds not raised by a party; or
> (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

Fed. R. Civ. P. 56(f).

As we recently stated, this Rule requires "that a court may grant summary judgment *sua sponte* only '[a]fter giving notice and a reasonable time to respond' and 'after identifying for the parties material facts that may not be genuinely in dispute.'" *In re 650 Fifth Ave. and Related Props.*, 830 F.3d 66, 96 (2d Cir. 2016) (quoting Fed. R. Civ. P. 56(f) (alteration in original)). The Supreme Court has emphasized that prior notice is a prerequisite to a *sua sponte* grant of summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence."). In addition to providing notice, a district court is also required to "identify[] for the parties material facts that may not be genuinely in dispute" before entering summary judgment *sua sponte*. Fed. R. Civ. P. 56(f)(3).[8]

A district court's failure to provide adequate notice is almost always reversible error, as it is here. A notice-free, *sua sponte* entry of summary judgment is "firmly discouraged" and is limited only to situations when there is no indication that the party against whom summary judgment would be entered

---

[8] The advisory committee notes to Rule 56(f) provide that "[i]n many cases it may prove useful first to invite a motion; the invited motion will automatically trigger the regular procedure of [Rule 56(c)]." Fed. R. Civ. P. 56, Advisory Committee Notes (2010 Amendments).

could present evidence that would affect the summary judgment determination. *Bridgeway Corp.*, 201 F.3d at 139; *see also Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167–68 (2d Cir. 1991); *Schwan-Stabilo Cosmetics GmbH v. Pacificlink Int'l Corp.*, 401 F.3d 28, 33 (2d Cir. 2005); *In re 650 Fifth Ave.*, 830 F.3d at 96–97.[9]

The District Court's notice-free *sua sponte* grant of summary judgment in this case was ill-advised. It concluded that the record before it did not contain documentation regarding the arrangement between O.W. Denmark and the other entities down the contractual chain to CEPSA. It then concluded that this lack of documentation was fatal to ING's assertion of a maritime lien by failing to establish a "traceable and intact" contractual chain that would ultimately place O.W. Denmark, ING's assignor, at financial risk for the bunkers. *See* October 2016 Order, 2016 WL 6156320, at *6.

ING put forth evidence that tended to establish its relationships down the contractual chain. ING submitted, as an exhibit to its S.D.N.Y. Local Civil Rule 56.1 statement in support of its motion for summary judgment, a declaration of

---

[9]     *In re 650 Fifth Ave.*, 830 F.3d at 96–97 ("We have emphasized that 'care should be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried.'" (quoting *Schwan-Stabilo Cosmetics GmbH*, 401 F.3d at 33)).

Claus Erik Mortensen, in which he attested that contractual relationships existed between the contract supplier (O.W. Denmark), the subcontractor (O.W. USA), and the physical supplier of the bunkers to the Vessel (CEPSA). *See* SA at 40–41, ¶¶ 16–18. Although specifics were not provided, he attested that O.W. USA was a "subcontractor" of O.W. Denmark and that CEPSA was a "sub-subcontractor of [O.W. Denmark] for the delivery of bunkers to [the Vessel]." *Id.* at 41, ¶ 18. These facts were incorporated into ING's Rule 56.1 statement, and the Vessel did not dispute them in its Rule 56.1 counter statement. Further, in its motion for reconsideration, ING submitted an additional declaration and offered documentation regarding the details of the contractual arrangements O.W. Denmark had with its subcontractors.

Thus, when the District Court granted summary judgment, it knew from the Mortensen declaration that some evidence existed concerning the contractual arrangements between O.W. Denmark and the entities down the chain. Insofar as the District Court concluded it required additional documentation on this point, the information ING presented at a minimum should have alerted the District Court that, given notice and an opportunity to do so, ING could have

provided additional information on an issue the District Court considered dispositive. The availability of this information was confirmed when ING provided it on its motion for reconsideration. To be sure, district courts are ordinarily not required to accept evidence on motions to reconsider that could have been adduced earlier. But here the District Court's failure to follow Rule 56(f) was not a technical lapse. By *sua sponte* entering summary judgment without affording ING the opportunity to present its relevant evidence, the District Court denied ING the procedures to which it was entitled under Rule 56.

## CONCLUSION

For the foregoing reasons, we **AFFIRM IN PART**, **VACATE IN PART**, and **REMAND** to the District Court for further proceedings consistent with this opinion.