ATTORNEYS FOR PLAINTIFF ING BANK N.V., 16 Civ. 95 (LLS); 16 Civ. 2051 (LLS); 16 Civ. 3456 (LLS); 16 Civ. 6453 (LLS): SEWARD & KISSEL, LLP, ONE BATTERY PARK PLAZA, NEW YORK, NEW YORK 10004, By: Bruce G. Paulsen, Esq., Brain P. Maloney, Esq., Laura Miller, Esq.
ATTORNEYS FOR DEFENDANT M/V TEMARA, 16 Civ. 95 (LLS): HOLLAND & KNIGHT LLP, 31 WEST 52ND STREET, NEW YORK, NEW YORK 10019, By: James H. Power, Esq., Marie E. Larsen, Esq.
ATTORNEYS FOR DEFENDANT M/V VOGE FIESTA, 16 Civ. 2051 (LLS): HOLLAND & KNIGHT LLP, 31 WEST 52ND STREET, NEW YORK, NEW YORK 10019, By: James H. Power, Esq., Marie E. Larsen, Esq.
ATTORNEYS FOR DEFENDANT M/V MARITIME KING, 16 Civ. 3456 (LLS): HOLLAND & KNIGHT LLP, 31 WEST 52ND STREET, NEW YORK, NEW YORK 10019, By: James H. Power, Esq., Marie E. Larsen, Esq.
ATTORNEYS FOR DEFENDANT M/V JAWOR, Civ. 6453 (LLS): FREEHILL, HOGAN & MAHAR, LLP, 80 PINE STREET, 25TH FLOOR, NEW YORK, NEW YORK 10005, By: Michael E. Unger, Esq., Gina M. Venezia, Esq.
OPINION & ORDER
LOUIS L. STANTON, U.S.D.J.
*559 In the above-captioned actions, remanded by the Second Circuit and reassigned to me from Judge Forrest, the issue to be decided on partial summary judgment is whether O.W. Bunker's assignment of its maritime liens to ING Bank is valid. ING Bank has moved in each case for judgment that it is. See 16-cv-95 (Dkt. No. 146); 16-cv-2051 (Dkt. No. 48); 16-cv-3456 (Dkt. No. 105); 16-cv-6453 (Dkt. No. 40).[1] For the following reasons, the motions are granted.
BACKGROUND
Each of these actions was commenced by ING Bank as a Rule C arrest action against the defendant Vessel for payment for marine fuel deliveries made under an agreement with an O.W. Bunker group entity. In each case, the Vessel's owner or charterer (the "Buyer") contracted with an O.W. Bunker entity (the "Seller") for the provision of marine fuel (or "bunkers") in a sale agreement entitled "Terms and Conditions of Sale for Marine Bunkers." (Dkt. No. 1, Ex. B) (the "Terms & Conditions"). The Terms & Conditions expressly acknowledge that the sale of bunkers creates a maritime lien on the Vessel for the price of the bunkers:
Where bunkers are supplied to a Vessel, in addition to any other security, the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel. It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof; including but not limited to the reasonable attorney's fees), such maritime lien afforded to the Seller over the Vessel. In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law, be it the place of delivery, or the flag of the Vessel, or the place of jurisdiction and/or an arrest of the Vessel, or otherwise howsoever.
Id. art. I.9. The Terms & Conditions provide explicitly that U.S. law "always" applies to its maritime liens:
The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in *560 equity or otherwise, in any jurisdiction where the Vessel may be found.
Id. art. P.5.
O.W. Bunker subcontracted with its local affiliates and physical suppliers to fulfill the Terms & Conditions, and the bunkers were delivered in accordance (except for nonpayment) with the terms of each of those agreements.
Each delivery was also covered by an O.W. security agreement, a separate financing arrangement not with the Vessel but with ING Bank. Under the English Omnibus Security Agreement (Dkt. No. 148, Ex. 2) (the "Security Agreement"), O.W. Bunker, as a Danish Receivables Chargor, in return for a $700 million revolving credit agreement with ING Bank, assigned its receivables from its sale of bunkers to the Vessel to ING Bank:
Each Danish Receivables Chargor hereby agrees to assign and hereby assigns absolutely, with effect as of the date of this Deed, subject to a proviso for reassignment on redemption, all of its rights, title and interest in respect of the New Supply Receivables.
Sec. Agmt. cl. 2.3.[2] "New Supply Receivables' " are defined as "any amount owing, or to be owed, to a Danish Receivables Chargor under any New Supply Contract." Id. at cl. 1.1. "New Supply Contract," in turn, is defined as
any one-time contract, or contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the Group, in each case governed by English law and relating to the sale of oil products traded by the Group, as governs the contractual relationship between the relevant debtor and a Danish Receivables Chargor ...
Id. cl. 1.1. After the Security becomes enforceable, ING Bank, as the Security Agent, can exercise "any of the rights of any Chargor in connection with any Security Asset, (Sec. Agmt. at cl. 5.7(b)(i) ), and O.W. Bunker waives any defense of "any unenforceability, illegality, invalidity or non-provability of any obligation of any person under any Finance Document or any other document or security," (id. at cl. 6.3(g) ). "Security Assets" are defined as "all assets and rights, title and interest of each Receivables Chargor, each Danish Receivables Chargor, each Insurance Chargor and each Brokerage Chargor held in those respective capacities which are the subject of any security created by this Deed." Id. at cl. 1.1. The Security Agreements do not expressly mention or name the maritime liens they assign.
After the O.W. Bunker group became insolvent in November 2014, ING Bank - as the assignee under the Security Agreement of all of O.W. Bunker's rights, title and interest in respect of the receivables from the fuel sales- sought to collect them by enforcing maritime liens against the Vessels under the Commercial Instruments and Maritime Liens Act, 46 U.S.C. § 31301 etseq. ("CIMLA").
On October 21, 2016, following briefing on motions for partial summary judgment, Judge Forrest denied ING Bank's motions and entered judgment sua sponte in favor of the Vessels. See ING Bank N.V. v. M/V TEMARA, 203 F.Supp.3d 355 (S.D.N.Y. 2016). Because Judge Forrest concluded that O.W. Bunker could not assert the maritime liens, she did not consider the effect of the Security Agreements' assignments of maritime liens to ING Bank.
*561 On appeal, the Second Circuit vacated and remanded those portions of Judge Forrest's judgment in each case, holding that the O.W. Bunker entity was entitled to enforce the maritime lien. See, e.g., ING Bank N.V. v. M/V TEMARA, 892 F.3d 511, 520 (2d Cir. 2018) ("Accordingly, we hold that O.W. Denmark was a provider of necessaries under CIMLA and may assert a maritime lien against the Vessel."). The Court described ING Bank as the "purported" assignee, ( id. at 519 ), but its analysis assumed the validity of the assignments, which was natural in light of the language of the agreements. If the assignments were invalid, consideration of the liens' validity would have been unnecessary.
On September 20, 2018, these cases were reassigned from Judge Forrest to me, to rule on a then fully briefed, but previously undecided issue whether O.W. Bunker's assignment in the Security Agreements of "all of its rights, title and interest" in the receivables effectively conveyed its maritime liens to ING Bank.
DISCUSSION
English Law
Although the Terms & Conditions subject maritime liens (wherever they arise) to U.S. law, the Security Agreements are governed by English law. Accordingly, the parties each submitted declarations by Queen's Counsel, discussing English principles of contract construction and their application to the Security Agreements. They broadly agree on the relevant principles of contract construction under English law, which are materially similar to U.S. law, e.g., considering the contract as a whole, construing the contract so as to make business commonsense.
English maritime liens are generally not assignable, although statutory rights in rem (which may arise in respect of bunkers) are assignable. Nonetheless, as viewed under English law on the construction of contracts in general, the Security Agreements effectively assign the maritime liens to ING Bank.
Under U.S. law, maritime liens are assignable, as they are regarded as attributes of the debt. THE PRESIDENT ARTHUR, 25 F.2d 999, 1000 (S.D.N.Y. 1928) ("The assignment of the claim carries with it the lien as security for the debt, whether the lien be mentioned in the assignment or not."); The Poznan, 9 F.2d 838, 842 (2d Cir. 1925) ("It is given by the law, and it gives the creditor a special property in the ship"), rev'd on other grounds sub nom., New York Dock Co. v. Steamship Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927). That is true even in cases where, as here, U.S. maritime liens are assigned by agreements governed by English law. See, e.g., Barcliff, LLC v. M/V DEEP BLUE, No. 14-cv-590-C (Admiralty) (Dkt. No. 93), 2016 WL 5660934, at *12, 2016 U.S. Dist. LEXIS 133253, at *60 (S.D. Ala. Sept. 28, 2016) (accepting in full Queen's Counsel Zacaroli's conclusion that "a maritime lien is 'within the category of 'rights ... in respect of ' the Supply Receivables and thus assigned to ING" under English law) (emphasis in original).[3] Assignments of U.S. maritime liens "must be in writing and notice thereof is to be given to the debtor."
*562 L & L Oil Co., Inc. v. M/V REBEL, 96 F.3d 1445, 1996 WL 512208, at *2, 1996 U.S. App. LEXIS 43467 at *5 (5th Cir. 1996).
Interpreting the Security Agreements
The Vessels' arguments, to wit that they are not parties to the Security Agreements which address money (not procedures) and do not mention maritime liens which are inapplicable under English law, and whose texts include "with respect to" for grammatical rather than commercial purposes, are unpersuasive.
Under the Security Agreements, O.W. Bunker absolutely assigns to ING Bank "all of its rights, title and interest in respect of the New Supply Receivables." The ordinary meaning of the phrase "all of its rights" would include the important statutory right to utilize a maritime lien.
Because of the cogency and clarity of its discussion of these matters, I quote in full text (excluding footnotes) the opinion of Magistrate Judge Cassady who tried the Barcliff case, which involved facts, issues and expert opinions virtually identical with this case:
The key clause of the Security Agreement at issue, of course, is Clause 2.3(a), which reads as follows: "Each Receivables Chargor ... hereby agrees to assign and hereby assigns absolutely, with effect as of the date of this Deed, subject to a proviso for reassignment on redemption, all of its rights, title and interest in respect of the Supply Receivables ." (ING Trial Exhibit 1, at 7 (emphasis supplied).) The Security Agreement defines "Supply Receivables" in Clause 1.1 as "any amount owing, or to be owed, to a Receivables Chargor ... under any Supply Contract[,] and "Supply Contract" as "any one-time contract, any contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the Group, in each case governed by English law and relating to the sale of oil products traded by the group, as governs: (a) the contractual relationship between the relevant debtor and a Receivables Chargor at any time ... and shall in each case include any invoice issued thereunder ..." (Id. at 5.)
And while it is all too clear that the Security Agreement nowhere makes mention of "maritime liens," that is, it does not say maritime liens are assigned, it actually utilizes much broader language in assigning all "rights, title and interest in respect of the Supply Receivables[,]" as explained by Mr. Zacaroli. This Court specifically agrees with the conclusion reached by Mr. Zacaroli that a maritime lien "is within the category of 'rights ... in respect of ' the Supply Receivables and thus assigned to ING[ ]" (ING's Trial Exhibit 41, at ¶ 25 (emphasis in original) ) and, in so concluding, adopts as its own the following statements/analysis of Mr. Zacaroli:
17. It is important to note that the subject matter of the assignment in clause 2.3(a) of the Security Agreement is all rights, title and interest "in respect of " the amounts owing or to be owed under any Supply Contract. Rights, title and interest "in respect of " a debt is a wider concept than rights, title and interest "under" a debt.
18. Whereas an assignment of rights title and interest "under " amounts owing under any Supply Contract would (in the absence of contrary indications in the remainder of the agreement or the circumstances in which it was entered into) suggest that the subject matter of the assignment was limited to the right to be paid the Supply Receivable, the assignment of rights, title and interest *563 "in respect of " any amounts owing under any Supply Contract indicates that the subject matter of the assignment is broader and extends to rights, beyond the mere right to be paid, which are connected with that right.
19. In particular, OW UK's right, title and interest in any maritime lien that arises as security for the payment of amounts owing under the Supply Contract is ... clearly one of its "rights " in connection with the amount owing under the Supply Contract, i.e., one of its "rights " in respect of the Supply Receivables. That is so whether the lien arises pursuant to the general law or pursuant to rights granted by the contract. A reasonable person, with the background knowledge reasonably available to the parties would ... have understood the reference to "all rights ... in respect of " the Supply Receivables to include such rights of security in relation to the Supply Receivables of which OWB had, or later acquired, the benefit.
(Id. at ¶¶ 17-19 (emphasis in original).)
It follows from the foregoing that all rights, title and interest in respect of the Supply Receivables under ING's Security Agreement include any and all of OW Bunkers UK's maritime liens. Because, as explained above, OW Bunkers UK possesses a maritime lien in this case for the value of the bunker stem delivered to the DEEP BLUE on November 1, 2014, ING now holds that lien by virtue of the assignment of that right in the Security Agreement.
Barcliff, LLC v. M/V DEEP BLUE, 2016 WL 5660934, at *12-13, 2016 U.S. Dist. LEXIS 133253, at *59-62 [All editorial alterations are in Barcliff; its footnotes are omitted.]
If the parties had intended to assign only the narrow right to receive payment for Supply Receivables and not also the effective right to secure it, they could have simply assigned "the Supply Receivables." To take that as what those Security Agreements contemplated would deprive their description of "all of its rights, title and interest in respect of the New Supply Receivables" of its full meaning.
CONCLUSION
The motions for partial summary judgment - 16-cv-95 (Dkt. No. 146); 16-cv-2051 (Dkt. No. 48); 16-cv-3456 (Dkt. No. 105); 16-cv-6453 (Dkt. No. 40) - are granted with respect to the issue of the validity of the assignments of the maritime liens.
So ordered.

The facts and arguments regarding assignment of the maritime liens are the same in each case. Unless otherwise specified, all docket numbers herein refer to documents filed in ING Bank N.V. v. M/V Temara, IMO No. 9333929, 16-cv-95.

This language is in clause 2.3(a) of the Security Agreement in the Maritime King and Ocean Harmony actions, and clause 2.3(b) of the Security Agreement in the Temara and Voge Fiesta actions.

Mr. Zacaroli concludes in this case, "Accordingly, under English law applicable to the Security Agreement, OW Bunker has validly and absolutely assigned to ING all of OW Bunker's right to receive payment of amounts owed for the bunkers delivered to the M/V TEMARA as well as OW Bunker's right to enforce any maritime lien arising in favour of OW Bunker as security for the payment of such amounts." Zacaroli Decl., Ex. 3 to ING's Stmt. of Uncontested Material Facts 132 (Dkt. No. 148-3).